STATE OF WEST VIRGINIA

*v.*

KIRTLEY E. BIAS

(No. 12956)

Submitted January 23, 1973.        Decided April 3, 1973.

*Daniel D. Dahill,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *George E. Lantz,* Deputy Attorney General, *Richard E. Hardison, E. Leslie Hoffman, III,* Assistant Attorneys General, for defendant in error.

NEELY, JUDGE:

This is an appeal from a final order of the Circuit Court of Logan County entered on November 1, 1967 sentencing the defendant below, Kirtley E. Bias, to five to eighteen years in the state penitentiary. The judgment of the circuit court was entered upon a jury verdict which found the defendant guilty of murder in the second degree. The appeal raises two questions for decision; first, whether the evidence adduced at trial was sufficient in law to support a conviction of second degree murder and secondly, whether certain evidence offered by the State should have been excluded.

In the morning of November 5, 1966 the defendant discovered the unconscious body of his wife, Jean Bias, on the first floor of his home. He then called the proper authorities after unsuccessful attempts to revive his wife, but she had expired. After an investigation by the police, probable cause to believe the defendant was criminally responsible for the death of his wife was established and the defendant was arrested, indicted and subsequently tried for murder.

Upon trial, on October 24, 1967, the following evidence from the State's witnesses was heard. An ambulance driver testified that in the morning of November 5, 1966 he was sent to the defendant's home where he found the deceased on the floor in the television room covered with pieces of blankets or throw rugs. This witness also testified that there was blood on the back of the victim's head.

The investigating police officer testified that after seeing the victim's body at the hospital he asked the defendant, "* * * How did she get beat up like she was beat up and he told me that him and her had been drinking that night and that him and her had scuffled [and] after they had the scuffle he went upstairs and went to bed."

The doctor who examined the victim upon arrival at the hospital testified that the victim's lips were swollen, there were bruises and two small lacerations on her face, a large bruise around her left eye, and a two inch laceration on the back of her head; however, upon a head and chest x-ray no fractures were found. The doctor also found an estimated twelve to eighteen inch burned area on the victim's right thigh and five or six abrasions on the victim's extremities.

Doctor Gerald D. Vanceton, a practicing pathologist, testified as follows:

> "The external examination of the body, the most predominant findings were multiple bruises noted over most of the body; prominent bruise on the forehead; on both eyelids, of both upper and

lower eyelids; the bruise in the nose, and the nose itself was bruised; the area of the right cheek; both the upper and the lower lip; the left side of the jaw; the left shoulder; over the left breast; the left arm; over the center of the lower abdomen; over the lower part of the abdomen; the right, lower leg was bruised; the right foot; and there was a bruise on the left knee. In addition to this, there were lacerations just beneath the chin and at the posterior part—excuse me, the rear part of the head, approximately this area (indicating)."

Additionally, Doctor Vanceton testified that there was a third degree burn on the right thigh ten inches in width at its widest and six inches at its narrowest point. He further testified that there was a large blood clot on the brain directly under the laceration. A two percent alcohol content was found in the system of the deceased but Doctor Vanceton said that in his professional opinion all of the bruises which he observed could not have been caused by a single fall. Doctor Vanceton was unable to say whether all of the bruises were received at the same time, and admitted that most people tend to fall when in an inebriated condition. He further stated that to produce the number of bruises in question would require a large number of falls. Lastly, he testified that the cause of death was a blood clot overlying the brain; however, he could not testify within a reasonable degree of medical certainty that the laceration on the head caused the clot, but he said that he thought that it did.

Doctor Siegfried Werthammer, a witness for the defense, testified that with a two percent alcohol content in the blood the deceased would have been in the stimulation phase of intoxication and would have staggered.

A state policeman testified over objection that he had observed blood stains at various places in the house. He testified that there was blood on the top of the stove, on the refrigerator door, in the upstairs bathroom in the

sink, on the floor, in the bathtub, and that there was a blood stained towel, a blood stained slip, and a similarly stained house coat.

The fourteen year old son of the defendant and the deceased, Michael Allen Bias, testified that when he came home from a football game around 10:30 p.m. on November 4, 1966, he found his father and mother drinking. He testified that he then went into the living room for a little while and soon retired for the night, but while in bed he heard noises downstairs which sounded like a fight. He then heard both his parents come upstairs and go into the bathroom. He testified that his mother came into his room and said that the defendant was going to take her to the hospital. Michael Bias further testified that his parents often fought and that they both drank a great deal. However, he added that when they were not drinking, they got along well together.

The defendant testified that on the night in question he had struck his wife in an argument, and that she had bled a great deal, and that he had sarcastically offered to take her to the hospital. He testified that after the fight both he and she went upstairs, and that she went into the bathroom to wash off the blood, and that thereafter both of them went back downstairs, at which time he left her on the first floor and proceeded to bed.

The defendant related that in the morning he found his wife and initially believed that she had become unconscious as a result of her drunken condition. He explained the bruises on her body by stating that on other occasions during the same week she had been drunk, and that during these episodes he had been required to drag her to bed, during the course of which process she often fell.

The defendant, the state trooper, and Michael Bias all testified that the stove downstairs was out of place, and a fall against that stove evidently accounts for the observed third degree burn on the body of the deceased.

It was in this posture that the case was submitted to the jury upon proper instructions. Under our decisions a court hearing an appeal in a criminal case has a limited role. Syllabus pt. 3 of the case of *State v. Lewis,* 133 W.Va. 584, 57 S.E.2d 513 (1949) correctly states the obligation of this Court with respect to a jury verdict in a criminal case. Syllabus pt. 3, which in turn quotes directly from syllabus pt. 1 of *State v. Bowles,* 117 W.Va. 217, 185 S.E. 205 (1936) says:

> "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the accused beyond a reasonable doubt, though the evidence adduced by the accused is in conflict therewith. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

In this case a thorough examination of all the testimony in the record does not convince the Court that the evidence was manifestly inadequate and that consequent injustice has been done. Clearly there was sufficient evidence to submit the case to the jury under State's instruction number nine which permitted the jury to return a verdict of (1) murder in the first degree; (2) murder in the second degree; (3) voluntary manslaughter; (4) involuntary manslaughter; and (5) not guilty.

Under our decisions, the *corpus delicti* consists in cases of felonious homicide, of two fundamental facts; (1) the death; and (2) the existence of criminal agency as the cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case. Syllabus pt. 6, *State v. Beale,* 104 W.Va. 617, 141 S.E. 7 (1927).

Ordinarily blows inflicted by one person on another with bare fists do not demonstrate the malice requisite to sustain a conviction of second degree murder. However, we have held that a protracted and continued beating with bare hands by a stronger person upon a weaker person can evince the malice necessary for a conviction of murder. In the case of *State v. Burdette*, 135 W.Va. 312, 63 S.E.2d 69 (1951), this Court held that a protracted beating with feet and hands where there was intent to kill, or do great bodily harm, sustained a conviction for first degree murder. The Court in *Burdette* cited with approval *McWhirt's Case*, 3 Gratt. (Va.) 595, in which the Court said:

> "It was strongly contended, that chastisement, and not death, of the deceased, was clearly intended. Malice aforethought may consist in the intention to do great bodily harm, as well as to kill; and whether the intention be the one or the other, and death happen, the law will not surrender its general presumption, that the homicide is murder. . . . Much stress was also laid upon the circumstance, that the prisoner might have resorted to deadly weapons, which were at hand, if he had designed any fatal injury to the deceased; and that, instead of employing these, he had only availed himself of the weapons which nature had furnished him with. And it was moreover insisted, that no case had been found deciding the homicide to be murder, when, under such circumstances, the fatal attack had been made only with the fists, and the death of the party beaten was not immediately produced under the infliction of the violence; but followed some time afterwards. The fists may not, indeed, be regarded generally as a deadly weapon; but they become most deadly, by blows often repeated, long continued, and applied to vital and delicate parts of the body of a defenceless [sic], unresisting man on the ground."

It is not the function of this Court to sit as a second jury in a criminal case. The jury was entitled to find from the direct and circumstantial evidence that the deceased was brutally assaulted and that the defendant

perpetrated the brutal assault. The body of the deceased was in a bruised and battered condition, there were blood stains in several places throughout the house, and direct testimony by the defendant and his son, Michael Bias, demonstrated that there was a drunken fight. The jury had an opportunity to hear live witnesses and to weigh their credibility. They also inspected exhibits and examined photographs taken of the deceased soon after the time of death. The cause of death was a massive hematoma of the brain and the deceased had a laceration on her head, which could lead reasonable minds to believe that her death was caused by a severe and prolonged beating on the head. Therefore, in reviewing all the evidence we conclude that there was sufficient evidence to convince impartial minds beyond a reasonable doubt that the defendant severely beat the deceased with the intention of killing her or of doing great bodily harm and, that as a result of this beating, the deceased died.

The second issue is whether the trial court erred by admitting the testimony of Trooper B. D. Gilbert over the objections and exceptions of the defendant. In defendant's brief in support of this appeal, he states that certain articles were admitted as evidence and that these articles were the result of an unlawful search and seizure. However, this is clearly wrong as the record is barren as to the admission of any such tangible evidence. The objection therefore lies in the admission of Trooper B. D. Gilbert's verbal description of where blood stains were found throughout the house since his observations were also the subject of an allegedly unlawful search.

Trooper Gilbert was first a witness for the State. The sole purpose of his testimony as a State's witness was to lay the foundation for the introduction of photographs lawfully taken of the deceased at the funeral home. These photographs were subsequently admitted into evidence. Upon cross-examination of Trooper Gilbert the defense inquired into the investigation of the scene of the alleged homicide. The purpose of this cross-examination

was to raise the theory that the deceased fell down the stairs to the first floor thereby causing the fatal injury. The trial court interrupted the defense counsel and warned, "You're making this man your witness to that because he was put on solely for these photographs." and the defense attorney replied, "That is true, your Honor. I'm attempting to determine what happened."

Before the State's cross-examination of Trooper Gilbert, who was now an adverse witness to the State, an in-chambers conference revealed that there was a question of whether Trooper Gilbert's presence at the scene of the alleged crime, althought within the course of investigation, was proper without a search warrant. Although certain articles of blood stained material were taken without a warrant, these articles were not introduced into evidence due to a prior motion to suppress. The trial court concluded that the scope of the State's cross-examination would be limited to showing where the blood stains were found. This conclusion was based on the rationale that the defendant began the inquiry and, consequently, the members of the jury were entitled to have all the evidence laid before them. Upon cross-examination, the extent of Trooper Gilbert's testimony went no further than the trial court's limitation.

Under the law of this State, the trial court's decision was clearly correct. In syllabus pt. 3, of *State v. Spurr,* 100 W.Va. 121, 130 S.E. 81 (1925) this Court said:

> "Where a party extends the cross-examination of a witness to facts and circumstances not connected with the matter testified to by him on direct examination, over objection of the other party, he makes the witness his own as to such facts and matters not falling within the legitimate scope of cross-examination."

Furthermore, once a party makes a witness his own, he waives any objection he may have made to the competency of the witness. *Starcher v. South Penn Oil Co.,* 81 W.Va. 587, 95 S.E. 28 (1918). The reason for this rule is that the party who has brought out the evidence in question

or has permitted it to be brought out can be fairly held responsible for its presence in the case.

Accordingly the judgment of the Circuit Court of Logan County is affirmed.

*Affirmed.*