466 S.E.2d 481

**STATE of West Virginia, Plaintiff Below, Appellee**

**v.**

**Russell E. GARRETT, Defendant Below, Appellant.**

No. 22832.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 13, 1995.

Decided Dec. 11, 1995.

**634**

James B. Lees, Jr., James A. McKowen, Hunt, Lees, Farrell & Kessler, Charleston, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Silas B. Taylor, Managing Deputy Attorney General, Victor S. Woods, Assistant Attorney General, Charleston, for Appellee.

McHUGH, Chief Justice:

This case is before the Court upon the appeal of Russell E. "Rusty" Garrett (hereinafter "appellant") from a final order denying post-trial motions and imposing a sentence of life imprisonment without the possibility of parole. On October 13, 1993, a jury found the appellant guilty of first degree murder for the death of Linda Lou Carpenter. This Court has before it the petition for appeal, all

1. According to the trial testimony of Detective Marvin Gary Stevens of the Kentucky State Police, a purse, identified as the victim's, was found approximately ten months later on secluded property owned by Clyde Porter. According to appellant's sister, Jeanne Buchanan, the appellant was acquainted with Mr. Porter's family. The purse contained, among other things, the victim's social security card, checkbook and a lighter with her name on it.

2. Appellant was originally indicted and tried on charges of first degree murder and grand larceny. Following the State's case-in-chief, appellant's motion for a directed verdict on the grand larceny charge was granted.

matters of record and the briefs and arguments of counsel. For the reasons discussed below, appellant's conviction in the Circuit Court of Roane County is affirmed.

I.

On or about May 21, 1990, Linda Lou Carpenter (hereinafter "victim") and her 1986 red and silver Chevrolet pick-up truck were reported missing by her husband, Ronald Carpenter. On or about August 13, 1990, four days after the victim's truck was recovered in Elliott County, Kentucky,[1] two hunters discovered the victim's skeletal remains scattered on a remote hillside, several miles from her home in Roane County, West Virginia.

A police investigation of the victim's death resulted in the issuance of an arrest warrant[2] for the appellant who, for more than two years, had been having an affair with the victim. The appellant was finally arrested in North Carolina on April 17, 1992, apparently after he was featured on a television program entitled "America's Most Wanted."[3]

At trial, the victim's husband, Ronald Carpenter, testified that he last saw his wife before he left for work on the morning of May 15, 1990. It was also on that morning that the victim last spoke with her friend, Jewell Strickland. Mrs. Strickland testified that when she spoke with the victim on the telephone between 10:30 a.m. and noon, the victim told her that the appellant had threatened to kill her. Mrs. Strickland further testified that at approximately noon on that day, the appellant telephoned her and told her that he had just shot the victim. On

3. This television program evidently "reenacted" the events surrounding the victim's death and portrayed the appellant as a brutal, hard-drinking and violent person who stalked the victim at her home on the night before he shot her. Following proceedings conducted on July 20, 1993, the trial judge granted the appellant's motion that the entire jury panel from Roane County be stricken for cause based upon the inflammatory nature of the aforementioned television program. Consequently, the jury in this case was impaneled from adjoining Jackson County.

direct examination, Mrs. Strickland testified, in relevant part, as follows:

Q. [by the State] Did anybody else call you?

A. Rusty Garrett.

. . . .

Q. What did Rusty have to say?

A. He called me and he said, 'Jewell?' And I said, 'Yes.' I said, 'Where you at?'

. . . .

A. He told me, he said, 'I'm at Linda's.' He said, 'I shot Linda.'

Q. Did he say anything else? Did you say anything?

A. I said, 'Oh, my God, you didn't.' And he said, 'Yes, I did.' I said, 'Where is she at?' He said, 'I picked her up and took her around back and laid her.'

Q. Did he say what he shot her with?

A. A .6 mm.

Q. Did you take that to be a kind of gun or what?

A. I don't know anything about guns, sir, I don't know what kind it is. He said—

Q. Just .6 mm.

A. Yes.

Q. Was that the end of the phone call?

A. No. He said that she was getting her breath hard now. And then he talked and he said, 'Her breath is getting shorter and shorter.' And he said, 'She's soon going to be gone.'. He said she asked him to take her to the hospital and he said, 'There's no use.'

. . . .

Q. This man just told you he shot probably your best friend. Did you ask him why?

A. I got to crying and upset and he said he was jealous, is why.

According to Mrs. Strickland, at approximately 5:00 the following morning, the appellant, with what appeared to be blood stains on his pants, drove to her home, alone, in the victim's truck:

[Mrs. Strickland] Well, he came on in and I said, 'Rusty, did you really kill Linda?' He said, 'Yes, Jewell, I did.'

. . . .

Q. [by the State] Did he tell you how he went about shooting her?

A. He said he knew we always talked, Linda and, I about that time of a morning and he said he thought he would let us talk our last talk. So he—when we got done talking, the way everything looks, she walked out and then's when he shot her.

Q. Where did he shoot her?

A. In the stomach, he said.

. . . .

Q. After he said he shot her, did he say he said anything to her or talk to her or anything like that?

A. Yes, he said that he talked to her and he told her, he said, 'What you've done, your courting around didn't pay, did it?' He said she said, 'Rusty, I've never been with nary other man but you.' And said that she told him said, 'Take me to the hospital.' And he said, 'There's no use.' She said, 'I love you.' And—

. . . .

Q. Well, if he told you he killed her, did you ask him what he did with her body?

. . . .

A. He wouldn't tell me. He said, 'I won't tell you.' And I said, 'Will they ever find her?' And he said, 'It will be a while, but they finally will find her.'

. . . .

Q. What was he going to do?

A. He said he was going to Kentucky, and then he was going on somewhere else, but he wasn't going to tell me where.

. . . .

A. He said he had Linda's purse with him and he asked me for some money.

Other evidence presented at trial also revealed that on the night before the appellant shot the victim, Charles Greathouse gave him a ride to a location not far from the victim's home. According to Mr. Greathouse, the appellant was carrying a rifle, a handgun and a trash bag of beer.

Connie Nichols, the victim's neighbor, testified that at approximately 9:00 am on May 15, 1990, the day the victim disappeared, she

had seen the victim and an unidentified man walking across the victim's front yard towards the victim's house. Mrs. Nichols further testified that at approximately 11:15 am, she heard "the crack of a high-powered rifle" from the direction of the victim's house. About forty-five minutes later, Mrs. Nichols, who had gone down the road to collect her mail, observed the victim's truck as it came out of the hollow where her home and the victim's home were located. Mrs. Nichols noticed that the truck was being driven by an unidentified man, that she could see no one else in the truck and that the truck, which usually turned right towards town, instead turned left.

Thomas Jackson Leslie of Olive Hill, Kentucky, testified that in early June of 1990, Larry Wayne Porter, Mr. Leslie's friend and with whom the appellant was also acquainted,[4] had driven to his home a red and gray Chevrolet pick-up truck with no license plate. According to Mr. Leslie, the two men rode around in the truck all night and again the next day. At trial, Mr. Leslie was shown a picture of the victim's truck and identified it as the same truck in which he and Mr. Porter rode in June of 1990.

The appellant's cousin, Jeffrey Garrett, testified that in January or February of 1992, the appellant had telephoned him from a town in Kentucky and asked him to meet him there.[5] Mr. Garrett gave police a statement in which he stated, in reference to the victim's death, that "[i]t did not happen the way they think. It did not happen like that. It was accidental."

Prior to trial, the appellant's counsel filed a motion in limine to preclude the State from eliciting testimony "in reference to a 'possible' murder or homicide" from its expert forensic pathologist, Dr. Irvin Sopher, Chief Medical Examiner for the State of West Virginia. In the Opinion section of the Postmortem Examination Findings prepared by Dr. Sopher, he had previously stated:

> The skeletal remains are identified as Linda Lou Carpenter, a 47 year old White female. Identification is accomplished on the basis of circumstances of death, personal effects, [( ] jewelry and clothing), corroborative anthropologic features as well as consistent dental characteristics. As usual, a specific cause of death is not indicated by the skeletal remains. The possibility of gunshot injury cannot be included or excluded. In consideration of the circumstances surrounding disappearance and death, the case is considered as homicide unless proven otherwise.

At proceedings on the motion in limine held on July 20, 1993, the trial judge indicated that "[t]he issue here is, whether or not Dr. Sopher should be allowed to give his opinion that this was a homicide based on hearsay statements or should his opinion be limited to what he observed and saw when he examined the skeletal remains." Dr. Sopher was permitted to testify "about what he observed in the [postmortem] examination and give what opinions he can give based upon his examination." An order reflecting this ruling was entered on July 23, 1993.

At trial, Dr. Sopher testified that the skeletal remains presented to him for examination were those of the victim in this case, Linda Lou Carpenter, based upon examination of the skeletal remains, which he determined to be those of a white female, approximately 45 years old and between 5' 4" and 5' 6" tall. Dr. Sopher considered these physical findings, which were strikingly similar to the victim's physicalities, as well as dental information[6] and the clothing and jewelry[7] found

---

4. See n. 1, supra.

5. According to Mr. Garrett, the two then travelled to Illinois where the appellant supposedly was interested in looking for work.

6. Dr. Sopher's examination of the skeletal jaw revealed that two molars, located on either side of the lower jaw, had been extracted early in life. No record of the victim's dental history was available. However, according to the victim's mother, the victim had two lower teeth pulled, one on either side of the lower jaw, when she was 12 or 13 years old.

7. The victim's husband and sister identified the shirt found with the skeletal remains to be similar to one owned and frequently worn by the victim. Significantly, the victim had cut the sleeves off of her shirt, the front of which displayed a picture of a deer in the scope sight of a gun, with the inscription "Go ahead, Buck, make my day." In particular, the sleeves of the recovered shirt had been cut off. Also found with the

on and around the skeletal remains. Also significant to Dr. Sopher's identification of the remains was the fact that the time frame in which the recovered skeleton died coincided with the time frame of Linda Lou Carpenter's mysterious disappearance.

Dr. Sopher also testified that the ovoid defect found in the right iliac (hip) bone was consistent with a bullet defect and, more specifically, would be consistent with a 6 millimeter rifle bullet. However, Dr. Sopher went on to testify, repeatedly, that he could not be certain that the ovoid defect was a bullet defect. Thus, based upon the post-mortem examination, Dr. Sopher was unable to determine the cause of death. However, Dr. Sopher did testify that based upon the ovoid defect in the victim's right hip bone, which was possibly a bullet defect, statements from law enforcement regarding the scenario of the death, the disappearance of the body and the location of the skeletal remains, the manner of death in this case, in his opinion, was homicide.[8]

Though the appellant offered an alibi defense, he was convicted of first degree murder and sentenced to life in prison without the recommendation of mercy. It is from this conviction that he now appeals.

## II.

Appellant's first assignment of error is that the trial court erred in admitting the testimony of its expert, Dr. Irvin Sopher, in that such testimony neither expressed an opinion nor assisted the trier of fact as required by *W.Va.R.Evid.* 702.

## A.

Our review of Dr. Sopher's testimony on direct examination reveals that he testified to more than his observations from the post-mortem examination of the skeletal remains. However, the record in this case also reveals that, even though Dr. Sopher's testimony was in violation of the court's in limine order, appellant's counsel[9] failed to object to it when it was first elicited on direct examination by the State. Instead, appellant's counsel elected to cross-examine Dr. Sopher in a manner also violative of the court's in limine order. It was not until eight more witnesses had testified and the State had rested its case that appellant's counsel finally moved to strike those portions of Dr. Sopher's testimony which were "based upon possibilities."[10]

■ We find that appellant's counsel failed to timely object to the introduction of Dr.

skeletal remains was a pendant and diamond wedding ring similar to ones worn by the victim.

**8.** The victim's death certificate issued by Dr. Sopher indicating that the cause of death was homicide was also admitted into evidence.

**9.** We note that appellant has retained new counsel for this appeal.

**10.** Appellant's counsel eventually moved to strike Dr. Sopher's testimony on the grounds that it violated the court's in limine order:

Okay, first of all, Judge, I want to make a motion to strike those portions of testimony given by Dr. Irvin Sopher that were based upon possibilities.

I think that was the Court's ruling and I think that at that point in time that I made that motion that case law was cited to the Court for the proposition that a Medical Examiner can't testify to possibilities.

The Court will recall its ruling and I don't know, I think would be kind of a difficult thing to do, but it could be done, to strike those portions of his testimony that dealt with the possibilities.

The trial judge ultimately denied the appellant's motion to strike, stating, in relevant part, the following:

I thought Dr. Sopher's testimony relating to ovoid oblique defect was right in on point. How could you quarrel with the man's testimony on that?

He says that this could be a gunshot hole made by a projectile from a gunshot, but he says he can't testify to that because it could have been made with something else. He can't say that it was. But he said it could have been and that's the testimony.

So I don't see any problem with his testimony on that. I thought it was very candid and straightforward and very professional.

The trial judge did, however, read to the jury the following limiting instruction regarding Dr. Sopher's testimony:

The Rules of Evidence ordinarily do not permit a witness to testify as to his opinion or conclusions. A so-called expert witness is an exception to this rule. A witness who by education and experience, has become an expert in any art, science, profession or calling, may be permitted to state his opinion as to a matter in which he is versed and which is material to this case. They may also state the reasons for such opinions.

You should consider such expert opinion received in this case and give it such weight as you think it deserves, and you may reject it

Sopher's testimony and has, thus, failed to preserve the record for appeal on this issue. *See Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 114, 459 S.E.2d 374, 391 (1995). As we have previously held:

> ' " ' "Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a . . . [forfeiture] of the right to raise the question thereafter in the trial court or in the appellate court." Point 6, Syllabus, *Yuncke v. Welker,* 128 W.Va. 299 [36 S.E.2d 410 (1945) ].' Syllabus point 7, *State v. Cirullo,* 142 W.Va. 56, 93 S.E.2d 526 (1956)." Syl.Pt. 5, *State v. Davis,* 180 W.Va. 357, 376 S.E.2d 563 (1988).' Syllabus Point 1, *Daniel B. by Richard B. v. Ackerman,* 190 W.Va. 1, 435 S.E.2d 1 (1993).

Syl. pt. 5, *Tennant, supra. See W.Va. R.Evid.* 103(a)(1) (requiring timely and specific objection or motion to strike where there is an error in the admission of evidence.)

■ On appeal, appellant's counsel maintains that his motion in limine to limit Dr. Sopher's testimony was sufficient to preserve the issue for appeal. In syllabus point 6 of *Bennett v. 3 C Coal Co.,* 180 W.Va. 665, 379 S.E.2d 388 (1989), this Court held that " '[a]n objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence.' Syllabus Point 1, *Wimer v. Hinkle,* 180 W.Va. 660, 379 S.E.2d 383 (1989)."

■ We find appellant's contention to be without merit. Our review of the record reveals that appellant did not receive an *adverse* ruling on his motion in limine. As previously indicated, the trial judge ruled in a July 23, 1993 order that Dr. Sopher would be permitted "to testify as to his personal observation during examination." Though the trial judge did not explicitly state that the appellant's motion in limine was "granted," we consider his ruling to have been favorable to the appellant. We can only logically assume that the appellant likewise viewed the ruling as favorable considering he made no objection to the court's in limine ruling. We recently explained in *Tennant,* 194 W.Va. at 114–15, 459 S.E.2d at 391–92 that our decision in *Bennett, supra,*

> was designed to eliminate the requirement of repeating objections to preserve an issue for appeal only in the limited situation when a litigant has objected to and received an adverse ruling. We neither considered nor intended that this narrow proposition should be extended to include litigants who received a favorable ruling. Furthermore, we have consistently stressed that litigants have a continuing obligation to draw the attention of the circuit court to the opposing party's violation of any favorable rulings. Extending *Bennett* would only serve to undermine trial court proceedings and the appeal process by permitting litigants to appeal on barren records when their trial court strategies fail to produce a desirable verdict. . . . Counsel for litigants have the responsibility [to] bring any violations to the court's attention. Without generalizing too broadly, it is normally the case that [monitoring an in limine order after it is entered] is the job of counsel and not an already burdened circuit judge.

Accordingly, we conclude that appellant's motion in limine did not preserve this issue for appeal.

## B.

■ In the alternative, appellant maintains that this Court may, in its discretion,

---

entirely if you conclude that the reasons given in support of the opinion are unsound.

And if you find that the facts upon which a particular expert relied are not sufficient to support the opinion or that the facts relied upon are erroneous you may reject the opinion.

In this regard the Court instructs the jury that you are to disregard any testimony and opinion of Dr. Sopher which was based on hearsay he may have received from law enforcement officers and are to limit your consideration of his evidence, testimony and opinions to those based upon his scientific and professional examination of the remains and clothing of the alleged victim.

review the admission of Dr. Sopher's testimony under the plain error doctrine. *See State v. Miller,* 194 W.Va. 3, 18, 459 S.E.2d 114, 129 (1995). In syllabus point 7 of *Miller,* we held that "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *See* syl. pt. 4, *Voelker v. Frederick Business Properties Co.,* 195 W.Va. 246, 465 S.E.2d 246 (1995). Because we find that the admission of Dr. Sopher's testimony was not error, the plain error doctrine does not apply.[11]

As we indicated above, the appellant contends that Dr. Sopher's testimony neither expressed an opinion nor assisted the trier of fact as required by *W.Va.R.Evid.* 702. Though appellant's argument is less than clear, it appears that his primary complaints are that Dr. Sopher testified that the manner of death in this case was homicide even though he could not give an opinion as to the cause of death and, in addition, that Dr. Sopher could not conclusively state that the ovoid defect in the hip bone of the recovered skeletal remains was the result of a bullet defect. We find that it was not error for the trial court to deny the appellant's motion to strike this testimony.

■ *W.Va.R.Evid.* 702 states:

**Testimony by Experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

11. As indicated above, the appellant made an untimely motion to strike Dr. Sopher's testimony after it had already been admitted into evidence. Thus, it is more appropriate to address appellant's contention in terms of the denial of his motion to strike.

12. Appellant also maintains, though rather obliquely, that Dr. Sopher's testimony that the manner of death in this case was homicide did not have a factual basis as required by *W.Va. R.Evid.* 703, which provides:

Under *W.Va.R.Evid.* 702, an expert "may testify … in the form of an opinion *or otherwise.* " (emphasis added). *See also United States v. Rahm,* 993 F.2d 1405, 1411 (9th Cir.1993). "Thus, not every expert need express, nor even hold, an opinion with regard to the issues involved in a trial.… [T]he decision whether to admit expert *testimony* does not rest upon the existence or strength of an expert's *opinion.* Rather, the key concern is whether expert *testimony* will assist the trier of fact, in drawing its own conclusion as to a 'fact in issue.' " *Id.* (emphasis provided). The inconclusiveness and "imprecision of the expert opinion goes to the weight of evidence for the jury, not admissibility of the evidence." *State v. Smith,* 220 Mont. 364, 715 P.2d 1301, 1308 (1986). Moreover, any flaws in the expert testimony can be subject to the cross-examination of its declarant. *People v. Hampton,* 746 P.2d 947, 952 (Colo.1987). *See* 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 7–2(A)(3) at 43 (3d ed. 1994) ("[a]bsolute certainty is not prerequisite to the admission of an expert's opinion. A qualified opinion may nonetheless assist the jury. Thus, the degree of the expert's certainty normally goes to the weight of the evidence, not to its admissibility."). *See also United States v. Baller,* 519 F.2d 463, 466 (4th Cir. 1975), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391; *United States v. Fleishman,* 684 F.2d 1329, 1337 (9th Cir.1982), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 ("Absolute certainty of result is not required for admissibility." Instead, certainty of expert's opinion goes to the weight of testimony, not admissibility.) We conclude, therefore, that the trial court properly denied appellant's motion to strike Dr. Sopher's testimony.[12]

**Bases of Opinion Testimony by Experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*See* syl. pt. 2, *Mayhorn v. Logan Medical Foundation,* 193 W.Va. 42, 454 S.E.2d 87 (1994); 2 Cleckley, *supra* § 7–3(B).

## III.

Appellant's second argument on appeal is that because the State failed to prove *corpus delicti,* his motion for judgment of acquittal should have been granted.[13] We find appellant's argument to be without merit.

In syllabus point 4 of *State v. Hall,* 172 W.Va. 138, 304 S.E.2d 43 (1983), this Court established the criteria necessary to prove *corpus delicti:* "To prove the *corpus delicti* in a case of homicide two facts must be established: (1) The death of a human being and (2) a criminal agency as its cause." [14] (footnote added). While the former need be proven by either direct evidence or presumptive evidence " 'of the strongest kind,' " the latter "may be established by circumstantial evidence or by presumptive reasoning from the adduced facts and circumstances." *Hall,* 172 W.Va. at 144, 304 S.E.2d at 49 (citations omitted). *See* syl. pt. 2, *State v. Bias,* 156 W.Va. 569, 195 S.E.2d 626 (1973). We find that the State adequately established the two facts necessary to prove *corpus delicti.* Thus, it was not error for the trial court to deny appellant's motion for judgment of acquittal and to allow the case to go to the jury.

The recovered skeletal remains in this case were sufficiently proven to be those of the victim, Linda Lou Carpenter.[15] The evidence presented at trial included Dr. Sopher's testimony that the physicalities of the recovered skeletal remains and the reported description of the victim were strikingly similar in terms of height, weight and age. Furthermore, according to the testimony of the victim's husband and sister, the clothing and jewelry found on and near the skeletal remains were likewise similar to those owned and worn by the victim. Finally, like the recovered remains, the victim had two lower teeth extracted when she was a child. We find that this evidence satisfactorily established the identity of the victim to be that of Linda Lou Carpenter.

The State further established, by both circumstantial evidence and presumptive reasoning, that the cause of the victim's death was by criminal agency. *Hall, supra.* The facts as they were presented at trial included the appellant's admission to witness Jewell Strickland that, on or about May 15, 1992, he had shot and killed the victim. The appellant's admission, standing alone, is not sufficient to sustain his conviction, however. We have previously held that

[a] conviction in a criminal case is not warranted by the extrajudicial confession of the accused, alone. The confession must be corroborated in a material and substantial manner by evidence *aliunde* of the *corpus delicti.* The corroborating evidence, however, need not of itself be conclusive; it is sufficient if[,] when taken in connection with the confession, the crime is established beyond reasonable doubt.

Syl. pt. 1, *State v. Blackwell,* 102 W.Va. 421, 135 S.E. 393 (1926). *See* syl. pt. 2, *State v. Taylor,* 174 W.Va. 225, 324 S.E.2d 367 (1984); syl. pt. 3, *State v. Dean,* 178 W.Va. 581, 363 S.E.2d 467 (1987). *See also State v. Mason,* 162 W.Va. 297, 304, 249 S.E.2d 793, 798

We disagree with appellant's contention that Dr. Sopher's testimony was based upon mere speculation and was in contradiction of the evidence. As we indicated above, Dr. Sopher testified that he based his opinion that the manner of death in this case was homicide upon the ovoid defect in the hip bone, which was possibly a bullet defect, statements from law enforcement regarding the scenario of the death, the disappearance of the body and the location of the body recovery. In *Mayhorn,* 193 W.Va. at 46, 454 S.E.2d at 91, we indicated that *W.Va.R.Evid.* 703 has been interpreted "to allow experts to rely on the reports and observations of others even though this might mean the expert is basing his opinion on hearsay." (*citing* 3 Jack B. Weinstein et al., *Weinstein's Evidence* § 703[01] at 703–11 (1994)). Clearly, then, the propriety of the trial court's in limine order which limited Dr. So-

pher's testimony to his observations at the postmortem examination is called into question. However, in light of our discussion above, *it is not necessary to address that issue.*

13. *See W.Va.R.Crim.P.* 29.

14. Corpus delicti "means proof that the crime occurred and that somebody's criminality was the source of the crime, as distinguished from noncriminal sources, e.g., accident or natural causes." *State v. Burton,* 163 W.Va. 40, 45, 254 S.E.2d 129, 134 (1979) (citation omitted).

15. Indeed, appellant does not seriously challenge the identification of the remains as those of Linda Lou Carpenter.

(1978); 1 Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure*, I–510 (2d ed. 1993). Other jurisdictions have stated that an accused's extrajudicial *admission*, in and of itself, is likewise not sufficient to establish the *corpus delicti*.[16] *See State v. Aten*, 79 Wash.App. 79, 900 P.2d 579, 584 (1995) ("[t]he corpus delicti rule requires corroboration of any statement made by the defendant, whether confession, admission, or even neutral description."); *Armstrong v. State*, 502 P.2d 440, 447 (Alaska 1972); *Schwab v. State*, 636 So.2d 3, 6 (Fla.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 364, 130 L.Ed.2d 317 ("A defendant's confession or statement 'may be considered in connection with the other evidence,' but 'the *corpus delicti* cannot rest upon the confession or admission alone.'" (citation omitted)); *Turner v. State*, 877 S.W.2d 513, 515 (Tex.Ct. App.1994) ("The State may not establish the corpus delicti solely with the defendant's extrajudicial admission. However, proof of the corpus delicti need not be made independent of an extrajudicial admission. If there is some evidence corroborating the admission, the admission may be used to aid in the establishment of the corpus delicti. The corroborating evidence is sufficient if it permits a rational finding of guilt, beyond a reasonable doubt, when joined with the extrajudicial admission." (citations omitted)); *State v. Vangerpen*, 125 Wash.2d 782, 888 P.2d 1177, 1185 (1995). *See also* 1 *McCormick on Evidence*, § 145 at 557 (John William Strong, ed., 4th ed. 1992); 7 John Henry Wigmore, *Wigmore on Evidence* § 2071 (Chadbourn rev. 1978).

■ We find it only logical to require a criminal conviction to rest on firmer ground than an accused's uncorroborated extrajudicial confession or admission. *See Armstrong, supra*. We hold, therefore, that the corpus delicti may not be established solely with an accused's extrajudicial confession or admission. The confession or admission must be corroborated in a material and substantial manner by independent evidence. The corroborating evidence need not of itself be conclusive but, rather, is sufficient if, when taken in connection with the confession or admission, the crime is established beyond a reasonable doubt.

■ Applying the aforementioned principle to the facts before us, we find that there was independent evidence presented at trial which corroborated the appellant's extrajudicial admission to Mrs. Strickland. The evidence established that the victim disappeared on the day her neighbor, Connie Nichols, heard "the crack of a high-powered rifle" from the direction of the victim's home. There was also testimony that, on the night before the murder, the appellant was dropped off near the victim's home, carrying a rifle and a handgun and, on the following day, was seen driving the victim's truck with bloodstains on his pants. Furthermore, Dr. Sopher testified that the ovoid defect in the victim's hip bone was consistent with a .6 millimeter bullet. We hold that this evidence corroborates, in a material and substantial manner, the appellant's admission that he shot and killed the victim and when viewed in connection therewith, establishes the crime beyond a reasonable doubt.

■ Finally, motions for judgment of acquittal are to be reviewed under the following standard:

'"Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *State v. West*, 153 W.Va. 325, 168 S.E.2d 716 (1969).' Syl. pt. 1, *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974).

Syl. pt. 10, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986). Consistent with our con-

---

16. "The purpose of the corroboration rule is to reduce the possibility of punishing a person for a crime which was never, in fact, committed." *Mason*, 162 W.Va. at 305, 249 S.E.2d at 798. *See Dean*, 178 W.Va. at 585–86, 363 S.E.2d at 471–72. "The [corpus delicti] doctrine guards not only against coerced confessions, but against uncorroborated admissions springing from a false subjective sense of guilt." *State v. Aten*, 79 Wash.App. 79, 900 P.2d 579, 584 (1995).

clusion above, we find that the evidence in this case, when viewed in the light most favorable to the State, was sufficient for a jury to justifiably find the appellant guilty beyond a reasonable doubt. Accordingly, it was not error for the trial court to deny appellant's motion for judgment of acquittal.

## IV.

Appellant's third assignment of error is that by denying his request for permission to retain a forensic pathologist, the trial court denied him due process of law in violation of the Fourteenth Amendment of the *United States Constitution.*[17] We find appellant's argument to be without merit.

The record reveals that on July 13, 1992, approximately fifteen months prior to trial, appellant, an indigent, who was appointed counsel pursuant to *W.Va.Code,* 29–21–1, *et seq.,* filed, among other things, a motion for leave to hire a forensic pathologist. *See State ex rel. Foster v. Luff,* 164 W.Va. 413, 418, 264 S.E.2d 477, 480 (1980) ("[A]n indigent should not be deprived of the ability to have relevant expert testimony to counter the state's experts.") That motion read, in its entirety, as follows: "Now comes the Defendant, RUSSELL EDWARD GARRETT, and moves the Court for an order granting the Defendant leave to hire an independent forensic pathologist and to provide payment of such pathologist for reasonable sum commenserate [sic] with service provided." By order dated July 20, 1992, the trial court ordered "[t]hat the Motion for Leave to Hire Forensic Pathologist is taken under advisement by the Court."

The record before us reflects no further mention, either by appellant's counsel[18] or the trial judge, of appellant's request to hire

a forensic pathologist. At the very least, discussion of such request would have been appropriate at the July 20, 1993 hearing, when appellant's motion in limine regarding the State's forensic pathologist was addressed. However, appellant failed to renew his motion during that hearing or at any time after he made the original motion some twelve months earlier.

■■■■ It is the responsibility of the parties to ensure that the record is preserved for our review. Indeed, appellant, as the moving party, must assume the burden of bringing his motion to the attention of the trial court. *State v. Moran,* 168 W.Va. 688, 691, 285 S.E.2d 450, 453 (1981). On appeal, this Court will not consider nonjurisdictional questions not considered by the trial court: " ' "This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syllabus Point 2, *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958).' Syl. pt. 2, *Duquesne Light Co. v. State Tax Dept.,* 174 W.Va. 506, 327 S.E.2d 683 (1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985)." Syl. pt. 2, *Crain v. Lightner,* 178 W.Va. 765, 364 S.E.2d 778 (1987). *See Wilkinson v. Searls,* 155 W.Va. 475, 481, 184 S.E.2d 735, 740 (1971). Accordingly, we find appellant's complaint that the trial court refused his request to hire a forensic pathologist to be without merit.[19]

## V.

As his fourth assignment of error, appellant complains that the trial court committed reversible error in reading to the jury the

---

17. *See* discussion, *infra,* regarding how this issue relates to appellant's claim of ineffective assistance of counsel.

18. Appellant explains that the death of his original attorney, David Ward, contributed to appellant's failure to pursue his motion for leave to hire a forensic pathologist. We cannot accept appellant's explanation. As the State has correctly pointed out, co-counsel Larry Whited co-signed appellant's motion and ultimately tried the case with attorney Kennad Skeen.

19. It is apparent from our review of appellant's motion for leave to hire a forensic pathologist

that appellant failed to adequately demonstrate the necessity to hire such an expert:

A request for additional expert fees under *W.Va.Code,* 51–11–8 [now 29–21–13 and/or 29–21–13a [1990]]: (1) should be made in writing; (2) the request should detail why the expert is needed; (3) defense counsel should be permitted an opportunity to elaborate on the motion; and (4) in ruling on the motion, the trial judge should place in the record the specific reasons for his ruling.

Syl. pt. 1, *Luff, supra.*

instruction on malice. We find no merit in appellant's complaint.

 Upon review of the record and in particular, that portion during which the jury instructions were discussed among counsel and the trial judge in chambers, we conclude that appellant's counsel was afforded the opportunity to object specifically to the offered malice instruction.[20] However, appellant's counsel made no objection to the instruction but rather, indicated his approval of it.[21]

 Under Rule 30 of the *West Virginia Rules of Criminal Procedure*, "[n]o party may assign as error the giving or the refusal to give an instruction ... unless he objects thereto before the arguments to the jury are begun, stating distinctly the matter to which he objects and the grounds of his objection[.]" As we held in syllabus point three of *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982): "The general rule is that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection." Accordingly, we find that the appellant has failed to preserve this issue for appellate review.[22]

**20.** The malice instruction read as follows:

The word malice as used in these instructions is used in a technical sense. It may be either expressed or implied, and it includes not only anger, hatred and revenge, but other unjustifiable motives. It may be inferred or implied by you from all the evidence in this case.

If you find such inference is reasonable from the facts and circumstances in this case which have been proven to your satisfaction beyond all reasonable doubt, it may be inferred from any deliberate and cruel act done by the Defendant without any reasonable provocation or excuse, however sudden.

Malice is not confined to ill will towards any one or more particular persons, but malice is every evil design in general. And by it is meant that the fact has been attended by such circumstances as are ordinarily symptoms of a wicked, depraved and malignant spirit and carry with them a plain indication of a heart, regardless of social duty, fatally bent upon mischief.

It is not necessary that malice must have existed for any particular length of time and it may first come into existence at the time of the act or at any previous time.

**21.** The thrust of appellant's argument is that the malice instruction which was read to the jury was overly broad in that it did not require the jury to find that malice must be shown against the victim. *See* n. 20, *supra.* Instead, the appellant argues, the court instructed the jury that malice may be inferred from any deliberate and cruel act done by the appellant, without linking such act to any act or person involved in the murder at issue. *See* syl. pt. 4, *State v. Jenkins*, 191 W.Va. 87, 443 S.E.2d 244 (1994) ("An instruction in a first degree murder case that informs the jury that malice need not be shown on the part of the defendant against the deceased is erroneous.")

Upon review of the entire malice instruction at issue, which this Court previously approved in *State v. Bongalis*, 180 W.Va. 584, 588 n. 1, 378 S.E.2d 449, 453 n. 1 (1989), we find that the jury was specifically instructed that malice "may be inferred or implied by you from *all of the evi-*

dence in this case if you find such inference is reasonable from facts and circumstances in this case which have been proven to your satisfaction beyond all reasonable doubt [.]" (emphasis added). This instruction sufficiently required the jury to find that malice must be shown by the appellant against the victim in this case.

**22.** Likewise, appellant's seventh assignment of error not only was not preserved below, but was also not argued on appeal. Consequently, it will not be addressed on appeal to this Court. Appellant contends that it was error for the trial court to permit the introduction at trial of photographs and videotape of the recovery of the skeletal remains. Appellant maintains merely that the admission of this evidence was so "inflammatory" and "unduly prejudicial" so as to warrant reversible error. However, appellant fails to elaborate on this argument any further. Appellant further argues that the following portion of the State's closing argument was also "inflammatory" and "unduly prejudicial" but, again, fails to explain in what regard:

'[H]e (the defendant) knew in May of 1990 with the hot weather coming on her body wouldn't last too long. The flies, maggots, the foxes, the carrion birds, the ripping of flesh and her clothing, he knew that there wouldn't be much left of her. She was scatt[er]ed all up and down that hillside by the time she was found.'

Appellant's trial counsel failed to object to the admission of the photographs and videotape as well as to the State's closing argument, thereby failing to preserve this error, if it was error, for appellate review. Syl. pt. 3, *O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 404 S.E.2d 420 (1991) (" 'Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal.' " (citation omitted)). Moreover, we note that on appeal, appellant's counsel failed to provide any argument in support of this assignment of error. Accordingly, this assignment of error is deemed waived. Syl. pt. 6, *Addair v.*

**644**

## VI.

 Appellant argues as his fifth assignment of error that the trial court should have dismissed the indictment in this case due to the State's improper influence on the grand jury. Though appellant frames this issue in terms of the alleged impropriety of the *State's* influence on the grand jury proceedings, he fails to provide an argument in this regard. Instead, appellant addresses the disqualification of grand juror and subsequent trial witness Connie Nichols without indicating how such disqualification, if any, constituted improper influence by the State. We therefore find appellant's contention that the State improperly influenced the grand jury proceedings to be waived: "Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived." Syl. pt. 6, *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981). *See State v. George W.H.,* 190 W.Va. 558, 563 n. 6, 439 S.E.2d 423, 428 n. 6 (1993); *State v. Green,* 187 W.Va. 43, 50, 415 S.E.2d 449, 456 (1992).

We shall address, however, whether appellant's motion to dismiss the indictment should have been granted[23] based upon trial witness Connie Nichols' presence on the grand jury which indicted him. In his motion to dismiss the indictment, filed only days before trial, appellant alleged, *inter alia,* that Mrs. Nichols had been interviewed by police in May of 1990 "regarding the crimes charged in the within [sic] indictment and a statement was obtained from [her] regarding said crimes." Appellant's motion further maintained that Mrs. Nichols had served on the grand jury which indicted the appellant, that she had subsequently been disclosed by the State as an anticipated trial witness, that her presence on the grand jury "may have substantially influenced the grand jury's decision to indict and raises grave doubt that the decision to indict was free from substan-

tial influence[,]" and that her presence on the grand jury violated appellant's constitutional rights.

 This Court has previously stated that "[t]he grand jury is an accusatory body, not a judicial body, and as such has the right and obligation to act on its own information, however acquired. *W.Va.Code,* 52–2–8. Its oath infers that it may be called upon to act in the case of enemies and friends. *W.Va. Code,* 52–2–5. 38 Am.Jur.2d *Grand Jury,* § 7, pp. 951–952." *State v. Bailey,* 159 W.Va. 167, 173, 220 S.E.2d 432, 436 (1975). Moreover, "[u]nder the provisions of *W.Va. Code,* 52–2–12, an indictment will not be quashed or abated on the ground that one member of the grand jury is disqualified." Syl. pt. 4, *Bailey, supra.* "The curative provisions of this statute are based on reason and sound public policy. It would be detrimental to the public interest, if a large number of indictments should be liable to be quashed or abated because one grand juror was disqualified." *Id.* at 174, 220 S.E.2d at 436. (citations omitted).[24] Accordingly, it is not necessary that we address whether Mrs. Nichols was, in fact, disqualified from serving on the grand jury which indicted the appellant, as such disqualification, if any, would not quash the indictment. Thus, it was not error for the trial court to deny appellant's motion to dismiss the indictment.

## VII.

Appellant's final assignment of error is that he was denied his right to effective assistance of counsel in the representation rendered by his court-appointed counsel. The appellant specifically maintains that counsel failed to pursue a request for a forensic pathologist and to introduce laboratory opinions which concluded there was no

---

*Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.")

23. We note that the record before us does not include, for our review, the trial court's order denying appellant's motion to dismiss the indictment.

24. *See State v. Oxendine,* 303 N.C. 235, 278 S.E.2d 200 (1981) (Defendant's motion to quash indictments for first degree murder and felonious assault with a deadly weapon on grounds that one of grand jurors which returned indictment against him was the brother of the murder victim and a witness for the State at defendant's trial was denied.)

evidence of gunshots on the victim's clothes.[25] Appellant further maintains that counsel failed to make objections, timely or otherwise, to the admission of the death certificate and Dr. Sopher's testimony, both of which indicated that the manner of death was homicide, to certain portions of Jewell Strickland's testimony,[26] to the malice instruction, to the admission of photographs and videotape of recovery of the skeletal remains and to inflammatory comments made by the State during closing arguments.

■ This Court has stated that an appellant's claim of ineffective assistance of counsel is generally not ripe for direct appellate review. *State v. Miller*, 194 W.Va. 3, 12, 459 S.E.2d 114, 125 (1995). We agree with the State's contention that it is impossible to discern from the record that which motivated trial counsel to act as they did. Indeed,

> intelligent review is rendered impossible because the most significant witness, the trial attorney, has not been given the opportunity to explain the motive and reason behind his or her trial behavior. . . . The very nature of an ineffective assistance of counsel claim demonstrates the inappropriateness of review on direct appeal. To the extent that a defendant relies on strategic and judgment calls for his or her trial counsel to prove an ineffective assistance claim, the defendant is at a decided disadvantage. Lacking an adequate record, an appellate court simply is unable to determine the egregiousness of many of the claimed deficiencies.

*Id.* at 12–13, 459 S.E.2d at 125–26 (footnote omitted).

As we held in syllabus point 10 of *State v. Triplett*, 187 W.Va. 760, 421 S.E.2d 511 (1992),

> [i]t is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.

Moreover, as reflected in this opinion thus far, the performance by counsel at trial was not error in every instance alleged by appellate counsel.[27] In any event, this Court cannot intelligently evaluate appellant's ineffective assistance of counsel claim, as an adequate record has not been developed reflecting trial counsel's explanation of their actions below. *Miller*, 194 W.Va. at 15, 459 S.E.2d at 128. Should appellant wish to pursue his ineffective assistance claim, he is not foreclosed from more properly developing it on a post-conviction collateral attack.[28] *Id.* *See also Miller* at syl. pts. 5 and 6 (outlining how ineffective assistance of counsel claims should be reviewed).

## VIII.

For reasons discussed herein, appellant's conviction of first degree murder in the Cir-

---

25. A forensic report prepared by the West Virginia State Police stated that, upon examination of the shirt found with the recovered skeletal remains, "[n]o evidence of any gunshot residue or damage could be found." Appellant further maintains that counsel failed to introduce evidence that examination of the truck upon its recovery in Kentucky some thirteen months after the murder revealed no evidence of foul play.

26. Specifically, appellant maintains that counsel should have objected to the following double hearsay testimony of Mrs. Strickland elicited by the State on direct examination:

> She told me that morning then when I talked to her I asked her how she was feeling, she had

> been not too well, and I said, 'Linda, how do you feel this morning?' And she said, 'Well, I feel a little better than I did.' But she said, 'Jewell, this is not what's going to kill me.' I said, 'Well, what's going to kill you, Linda?' And she said, 'Rusty.' Said, 'He told me he was going to kill me.' I said, 'Well, if he told you he was going to kill you, why don't you do something about it?' And she said, 'I have told some of them,' but she didn't say who it was.

27. For example, the admission of Dr. Sopher's testimony and the reading of the malice instruction to the jury.

28. According to appellant's brief, he has not sought habeas corpus relief in the lower court.

cuit Court of Roane County is hereby affirmed.

Affirmed.

ALBRIGHT, J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.