IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2023 Term

**FILED**

**November 1, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos. 21-0969 and 22-0278

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

TODD C.,
Defendant Below, Petitioner.

Appeal from the Circuit Court of Putnam County
The Honorable Phillip M. Stowers, Judge
Case No. CC-40-2020-F-92

AFFIRMED

Submitted: September 27, 2023
Filed: November 1, 2023

Mark A. Barney, Esq.
BARNEY LAW PLLC
Hurricane, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Lindsay See, Esq.
Solicitor General
Jason David Parmer, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syllabus Point 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998).

2.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

3.      "The corpus delicti may not be established solely with an accused's extrajudicial confession or admission.  The confession or admission must be corroborated in a material and substantial manner by independent evidence.  The corroborating evidence need not of itself be conclusive but, rather, is sufficient if, when taken in connection with the confession or admission, the crime is established beyond a reasonable doubt." Syllabus Point 5, *State v. Garrett*, 195 W. Va. 630, 466 S.E.2d 481 (1995).

4.    "The State in a criminal case may prove the venue of the crime by a preponderance of the evidence, and is not required to prove the same beyond a reasonable doubt."  Syllabus Point 5, *State v. Burton*, 163 W. Va. 40, 254 S.E.2d 129 (1979).

5.    "Under the 'plain error' doctrine, 'waiver' of error must be distinguished from 'forfeiture' of a right.  A deviation from a rule of law is error unless there is a waiver.  When there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined.  By contrast, mere forfeiture of a right—the failure to make timely assertion of the right—does not extinguish the error.  In such a circumstance, it is necessary to continue the inquiry and to determine whether the error is 'plain.'  To be 'plain,' the error must be 'clear' or 'obvious.'"  Syllabus Point 8, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

6.    "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syllabus Point 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

7.    "An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule

should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings." Syllabus Point 7, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

8.      "A babysitter may be a custodian under the provisions of *W. Va. Code* 61-8D-5 [1998], and whether a babysitter [is] in fact a custodian under this statute is a question for the jury." Syllabus Point 1, *State v Stephens*, 206 W. Va. 420, 525 S.E.2d 301 (1999).

**WALKER, Chief Justice:**

Petitioner Todd C. was convicted at trial of eight counts of sexual abuse of his four nieces.[1] He was sentenced to four concurrent terms of one to five years for violation of West Virginia Code § 61-8B-7 (sexual abuse in the first degree) that were to run consecutively with his four consecutive terms of incarceration for violation of West Virginia Code § 61-8D-5 (sexual abuse by a parent, guardian, custodian, or person in a position of trust).[2] In these consolidated appeals, Petitioner, for the first time, raises an ex post facto violation relative to the jury's instruction and seeks a new trial. But he cannot meet his burden under a plain error analysis to show that the statutory amendments operated to his detriment such that the jury would have reached a different outcome. Petitioner alternatively seeks a reduction in his sentence based on ex post facto principles, namely that his criminal conduct that led to his conviction on Count III occurred before the statute was amended to increase the penalty. We affirm the circuit court's conclusion that there was sufficient evidence of sexual abuse after the statutory amendments to subject him to the harsher penalty.

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[2] Petitioner was sentenced to ten to twenty years' imprisonment for Counts I through III, and five to fifteen years' imprisonment for Count IV.

1

Petitioner also appeals the denial of his motion for a judgment of acquittal based on one niece's failure to testify, arguing that the corpus delicti of his crimes against her was not established independently from his confession. Specifically, Petitioner argues there was insufficient evidence for the jury to have convicted him on the two counts associated with her abuse because it was not shown that the crimes occurred in Putnam County or that he received sexual gratification. We find that the corpus delicti is not coextensive with every element of the State's case, and that here, the corpus delicti was readily satisfied. We likewise reject Petitioner's sufficiency of the evidence argument that a rational jury could not have concluded that the crimes were committed in Putnam County or that there was sufficient proof of sexual gratification.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves allegations of sexual abuse that were leveled nearly twenty years before Petitioner was indicted for the criminal conduct. Our factual recitation is chronological, but because the extent of the allegations was not fully developed until trial, trial testimony is used, where necessary, to supplement pre-indictment circumstances.

### A.    *Underlying Criminal Conduct*

Petitioner lived in his parents' basement in Putnam County, West Virginia. His brother, S.C., moved back to West Virginia in 1998 with his children and visited the grandparents' home once or twice per week. Petitioner had a television and video games in the basement. He would often take the children to his basement living space or would

2

ask for one child in the basement at a time. In March 2003, three of Petitioner's nieces disclosed years-long abuse to their parents.[3] S.C. emailed Petitioner informing him that niece M.C. had disclosed the abuse to her mother, J.C., and that the other girls recounted a similar pattern of abuse. S.C. demanded Petitioner stay away from the girls altogether. Petitioner called S.C. after receiving the email and wept and apologized, but maintained, "it's not that bad." S.C. responded that he knew the abuse went on for a long time with his daughter, H.C. and maybe his daughter, A.C., which Petitioner admitted to S.C. The conversation also led S.C. to ask if Petitioner had groomed S.C.'s other daughters, M.C. and L.C., in the same way he had groomed H.C., and Petitioner responded "yes."

The parents contacted law enforcement in Kanawha County. Petitioner willingly came in for an interview with then-Senior Trooper Christopher Zerkle of the West Virginia State Police.[4] During that interview, Petitioner admitted to touching H.C.'s breasts when she was nine or ten years old and detailed that H.C. would place his hand between her legs on her vagina and apply pressure. Petitioner acknowledged that he should have removed his hand and did not, but he denied that it was sexual. Petitioner further stated that he was like "an extra dad or an older brother" to the children and admitted that

---

[3] One of Petitioner's nieces who later became a subject of the underlying criminal proceeding did not disclose sexual abuse in 2003, later testifying that she denied it at the time because she believed she had done something wrong.

[4] Petitioner was read and waived his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). As noted below, Petitioner does not allege any procedural or substantive defects in his 2003 statement.

3

he had touched the girls' buttocks either intentionally or by accident while rubbing their backs. The interview was digitally recorded and transcribed. However, the digital recording of that interview was disposed of, reportedly pursuant to State Police record retention policies.

Then-Senior Trooper Zerkle spoke with the prosecutor about how Petitioner should be charged, but in the meantime, S.C. decided not to pursue charges, claiming that he had been advised by the child liaison that the defense would be that the girls had provoked Petitioner into acting out sexual stimulations and that he should consider whether he wanted to subject the girls the trauma of investigation, trial, and cross-examination. The paternal grandparents sided with Petitioner and the families were estranged for three years until S.C. felt compelled by his faith to forgive Petitioner and reopened communication. The children expressed that they felt betrayed by that decision; H.C. in particular was traumatized and unresponsive to counseling.

## B.    *Indictment and Pre-trial Matters*

When L.C., the youngest of the girls, turned eighteen, she learned that it was not too late to pursue charges against Petitioner. While Kanawha County authorities declined to pursue charges, the Putnam County prosecutor, where the grandparents' home is located, did agree to pursue charges against Petitioner. Petitioner was indicted in November 2020 on four counts of sexual abuse by a parent, guardian, custodian, or other person in a position of trust; four counts of sexual abuse in the first degree; and one count

4

of sexual assault in the first degree.[5]  His conduct related to the sexual abuse of L.C., M.C., and H.C. was alleged to have occurred between January 1998 and December 2003.  His abuse and sexual assault of A.C. was alleged to have occurred between January 1993 and December 2003.

Pre-trial, Petitioner objected to use of the transcript of his 2003 interview with now-Lieutenant Zerkle, arguing that it was inadmissible under Rules 403,[6] 901,[7] and 1004[8] of the West Virginia Rules of Evidence.  Petitioner later filed a written motion in

---

[5] Counts I and V relate to sexual abuse of L.C.; Counts II and VI relate to sexual abuse of M.C.; Counts III and VII relate to sexual abuse of H.C.; and Counts IV, VIII, and IX relate to sexual abuse and sexual assault of A.C.

[6] West Virginia Rule of  Evidence 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[7] West Virginia Rule of Evidence 901 states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

[8] West Virginia Rule of Evidence 1004 provides that:

> [a]n original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if:
>
> (a) Originals Lost or Destroyed. All the originals are lost or destroyed, and not by the proponent acting in bad faith; or
>
> (b) Original Not Obtainable. An original cannot be obtained by any available judicial process; or
>
> (c) Original in Possession of Opponent. The party against whom the original would be offered had control of the original

5

limine, in which he raised the same grounds for exclusion of the transcript. The court

determined that Lt. Zerkle's testimony at the pre-trial hearing satisfied Rules 901 and 1004

of the West Virginia Rules of Evidence, and that prejudice did not substantially outweigh

the probative value of the transcript under Rule 403, and so denied S.C.'s motion in limine.

### C.     *Trial Testimony*

At trial, L.C., M.C., and A.C. testified, as did K.C., their older sister. But

H.C. was not present at trial and did not testify. L.C. testified that she and her siblings

would often go to the basement with Petitioner because there were fun things down there,

and that Petitioner served as their babysitter who was charged with their care. Specifically,

L.C. testified that "[i]f there was a question of like could we do something, could we not,

it was my uncle that gave us permission or said no, you can't. You know, he was in

charge."

Recounting the abuse, L.C. testified that Petitioner would sit with her on the

chair or couch and would put his arm around her and into the back of her pants. L.C.

testified that Petitioner would "rub [her] bottom up and down or he would just cradle [her]

butt and hold it there" and used his pinky finger to touch her vaginal area – always under

---

was put on notice–by pleadings or otherwise–that the original
would be a subject of proof at the trial, hearing or deposition;
and then fails produce it when required to do so; or

(d) Collateral Matters. The writing, recording, or photograph is
not closely related to a controlling issue.

6

a blanket and never down the front of her pants where it could be seen by the others in the basement. L.C. further testified that Petitioner would rub her breasts under her shirt while she sat on his lap. L.C. recalled that, in one instance, Petitioner would not let her get up from his lap, so H.C. yelled at her to run. At that point, L.C. testified, she began to understand why her older sisters seemed to hate Petitioner. Finally, L.C. testified that the abuse primarily occurred at her grandparents' home in Putnam County and continued until she was nine years old when M.C. reported Petitioner's abuse to their parents.

M.C.'s testimony relating to Petitioner's living situation and access to the children was similar to that of L.C., noting that they went down to the basement because Petitioner had "cool gadgets . . . candy . . . and video games," and that since he was the adult in the room, it was assumed that he was their supervisor or babysitter. M.C. recalled that Petitioner would sit beside her with his arm around the back of her. She stated that he would put his hand down the back of her pants, under her underwear and "go as far forward as he could and just rub all over." Like L.C., M.C. testified that Petitioner never put his hand down the front of her pants to avoid being seen. She also testified that she specifically remembered being eight years old when he put his hands under her shirt and that he had touched her breasts and her vagina. Though M.C. could not say with certainty when Petitioner put his hand down her pants because she "[didn't] remember that ever not happening," she did testify that at the time she was young enough that she did not understand the term "vagina" or recognize that he put his finger inside her labia.

7

M.C. further testified that she was aware that Petitioner was also abusing L.C. and H.C. and reported the same to her mother. As to H.C.'s absence from the trial, M.C. testified that H.C. blamed their parents for not pursuing charges in 2003, had become bitter and poisonous from the trauma, and was an alcoholic. For those reasons, in addition to her ongoing struggle with the trauma she had suffered, M.C. believed that H.C. was not ready to come forward and testify.

A.C., like her sisters, testified that Petitioner's conduct toward her occurred while sitting on Petitioner's lap or sitting beside him in his basement living space at their grandparents' home. Specifically, she testified that Petitioner put his hands on her thigh and eventually moved to her vagina, and she also testified that Petitioner put his fingers inside her vagina before she was ten years old. A.C. testified that she was ten years old the last time Petitioner touched her, and, on that occasion, he had touched her chest both under and over her clothes. A.C. recalled that she felt Petitioner's erection behind her but did not understand at the time what that meant. A.C. also testified that she denied that she had been touched back in 2003 to her parents and to Lt. Zerkle because she felt as though she had done something wrong.

K.C. was not the subject of any charges, but she testified as to her own experiences with Petitioner and what she understood was happening in real time to her sisters, as she had diary entries from 2003. As to the former, she testified Petitioner had put his hand down the back of her pants on one occasion and when she jumped up and ran

8

from the room, he never touched her that way again. K.C. expressed that she hated Petitioner and had distanced herself from him as much as possible, but when she would see her siblings sitting on Petitioner's lap, she would yell at them to get up. Her diary entries from March 2003 reflect the day her sisters disclosed the abuse to her parents and contain her personal reflections, "you know how he always had a touching problem," "[h]e hasn't like taken purity away but it's still child molesting nonetheless," and "this whole situation is making me sick." Her journal also reflects the fallout between her father and grandparents over the situation, as well as some of the information then-Senior Trooper Zerkle relayed to the family about Petitioner's interview.

In addition to the victims and K.C., Lt. Zerkle and the parents testified during the State's case-in-chief. Lt. Zerkle's testimony was limited to his investigation in 2003. During his testimony, the transcript of Petitioner's statement was read into evidence, and Lt. Zerkle testified that L.C., M.C., and H.C. reported similar events as Petitioner himself had described and more.

S.C. testified about his ongoing discussions with Petitioner as the girls were growing up that they were uncomfortable with the way he touched them, and, ultimately in response to H.C.'s complaint about Petitioner's touching said Petitioner would have no more contact with the girls if he did not stop. Despite these ongoing conversations, S.C. testified that Petitioner took H.C. to Kings Island and had asked to spend the night with her but S.C. insisted Petitioner bring her home. When the parents spoke with the girls in 2003

9

following M.C.'s disclosure, H.C. disclosed to them that on the morning they were to leave for Kings Island, Petitioner had pulled H.C. into bed with him. Petitioner's statement to law enforcement reflects that Petitioner was naked, although covered by a blanket, when he pulled H.C. into the bed.

S.C. testified to the email he sent Petitioner after the girls' disclosures and subsequent phone call with Petitioner during which Petitioner admitted to ongoing abuse of H.C. and A.C. and that he had groomed M.C. and L.C. to do what he had done to H.C. S.C. testified to his reasons for not pursuing the charges in 2003 and the damage it had caused to his family.

J.C. testified that they visited her in-laws often and that the children spent time in the basement with Petitioner. She recalled that at some point, Petitioner said he wanted only one child in the basement at a time and would take H.C. downstairs alone then later would take M.C. down. She further testified that L.C. began bed wetting, and that H.C. and M.C. began masturbating at a very young age. K.C., around age nine, told J.C. that she did not like Petitioner touching her. Later, in 2003, M.C. came to J.C. and said she did not like the way Petitioner touched her, and the parents had M.C. show them where he touched her. M.C.'s disclosure that Petitioner had put his hand down her pants and that Petitioner touched L.C. and H.C. in the same way prompted the parents to speak to all of their daughters separately about their experiences with Petitioner. A.C. denied to J.C. that Petitioner had touched her, but L.C. and H.C. confirmed the abuse.

Petitioner moved for a judgment of acquittal on Counts III and VII related to H.C., arguing that there was insufficient evidence to allow those charges to go to the jury.[9] This argument was premised, in large part, on H.C. not being present to testify. The circuit court initially questioned whether there was sufficient evidence that H.C.'s abuse occurred in Putnam County. The circuit court ultimately denied the motion finding there were sufficient inferences that the jury could draw from the testimony of others.

Petitioner then presented his case, which included only the testimony of Chad Watson, Petitioner's coworker in children's ministry who vouched for Petitioner's good character and stated he had no concerns about Petitioner being around children, including his own. At the close of his case, Petitioner renewed his motion for judgment of acquittal as to Counts III and VII that related to H.C., but that motion was again denied.

### D.    *Jury Instructions*

The circuit court instructed the jury on the elements of sexual abuse in the first degree and sexual abuse by a parent, guardian, custodian, or other person in a position of trust as to each child:

> Sexual abuse in the first degree is committed when any person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion, or such person subjects another person to sexual contact who is physically helpless, or such person being fourteen years old or

---

[9] *See* W. Va. R. Crim. P. 29.

more subjects another person to sexual contact who is younger than twelve.

Sexual abuse by a parent, guardian, custodian, or other person in a position of trust is committed when any parent, guardian, custodian, or other person in a position of trust in relation to a child under his or her care, custody or control engages or attempts to engage in sexual exploitation or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct, then, such parent, guardian, custodian or person in a position of trust shall be guilty of a felony.

The circuit court also instructed the jury on both the definition of "custodian" and "person in a position of trust." The former was defined for the jury as

A person over the age of fourteen years who has or shares actual physical possession or care and custody of the child on a full-time or temporary basis, regardless of whether that person has been granted custody of the child by any contract, agreement or legal proceeding. A "custodian" shall include, but not be limited to, the spouse of a parent, guardian or custodian, or a person cohabiting with a parent, guardian or custodian in a relationship of husband and wife, where such spouse or other person shares actual physical possession or care and custody of a child with the parent, guardian or custodian. Additionally, a babysitter may be a custodian for purposes of the statute prohibiting sexual abuse by a custodian, whether a babysitter is, in fact, a custodian is a question for the jury.

"Person in a position of trust" was then defined as referring to

any person who is acting in the place of a parent or guardian with any of a parent's rights or duties or responsibilities concerning the child or someone responsible for the general

12

supervision of a child's welfare, or any person who by virtue of their occupation or position is charged with any duty or responsibility for the health, education, welfare, or supervision of the child.

"Sexual contact," being common to both sexual abuse offenses and the operative portion of the relevant statutes, was defined for the jury on Counts I through IV (sexual abuse by a parent, guardian, custodian or person in a position of trust) as

> any intentional touching, either directly or through clothing, of the breasts, buttocks, anus or any part of the sex organs of another person, or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.

But, instructing on Counts V through VIII (sexual abuse in the first degree), the circuit court defined "sexual contact" as

> Any intentional touching, either directly or through the clothing, of the anus or any part of the sex organs of another person or the breasts of a female or intentionally touching any part of another person's body by the actor's sex organ, where the victim is not married to the actor and the touching is done for the purpose of gratifying a sexual desire of either party.

## E.     *Verdict and Sentencing*

Petitioner was acquitted on the sexual assault charge as to A.C. (Count IX) but convicted on all four counts of sexual abuse by a parent, guardian, custodian, or person in a position of trust (Counts I, II, III, and IV).  He was also convicted on all four counts of sexual abuse in the first degree (Counts V, VI, VII, and VIII).  For his convictions for sexual abuse by a parent, guardian, custodian, or person in a position of trust, Petitioner

13

was sentenced to four consecutive terms of not less than ten nor more than twenty years in prison. For his convictions of sexual abuse in the first degree, Petitioner was sentenced to four concurrent terms of not less than five nor more than twenty-five years, to be run consecutively with his convictions on Counts I through IV. Petitioner filed appeal No. 21-0969 from that original sentencing order raising sufficiency of the evidence and ex post facto arguments related to his trial.

On February 3, 2022, Petitioner filed a motion to correct an illegal sentence, arguing that the statutory penalties to which he was subjected at sentencing were harsher than those in effect at the time of his crimes and, for that reason, violated ex post facto principles.[10] Specifically, the penalty under West Virginia Code § 61-8B-7 (sexual abuse in the first degree, Counts V, VI, VII, and VIII) increased from one to five years' imprisonment to five to twenty-five years effective 2006. Similarly, the State indicted him for crimes that concluded in March 2003, and the supervised release statute was not enacted until June 2003. The State conceded that the pre-amendment penalty in § 61-8B-7 should apply to Petitioner's convictions on Counts V through VIII and that the period of supervised release could also not be imposed for any of his convictions.[11] The circuit court

---

[10] *See* Syl. Pt. 1, *Adkins v. Bordenkircher*, 164 W. Va. 292, 262 S.E.2d 885 (1980) ("Under Ex post facto principles of the United States and West Virginia Constitutions, a law passed after the commission of an offense which increases the punishment, lengthens the sentence or operates to the detriment of the accused cannot be applied to him.").

[11] *See* Syl. Pt. 3, in part, *State v. Deel*, 237 W. Va. 600, 788 S.E.2d 741 (2016) ("Any retroactive application of the supervised release statute [West Virginia Code § 62-12-26]

14

corrected Petitioner's sentence to reflect the pre-amendment penalty for sexual abuse in the first degree for Counts V through VIII, ordered that the sentences run concurrently, and struck the period of supervised release.

Petitioner additionally argued that his sentences on Counts I through IV for violations of West Virginia Code § 61-8D-5 (sexual abuse by a parent, guardian, custodian, or person in a position of trust) should be corrected because that statute increased the penalty from five to fifteen years in the penitentiary to ten to twenty years, effective June of 1998. For these four convictions, three were alleged by indictment to have occurred from January 1998 to March 2003, and Count IV, related to A.C. was alleged to have occurred from January 1993 to March 2003. The circuit court examined the evidence presented on each count with particular attention to temporal evidence and found that there was sufficient evidence to support the conclusion that the abuse of L.C., M.C., and H.C. had occurred after the June 1998 amendments and denied Petitioner's motion to correct his sentences on Counts I through III. The circuit court did correct Petitioner's sentence as to Count IV, and the amended sentencing order reflects a five-to-fifteen-year sentence on that count.

---

to an individual who committed any of the enumerated sex offenses prior to the effective date of the supervised release statute violates the constitutional prohibition against ex post facto laws set forth in article III, section 4 of the West Virginia Constitution and Article I, Section 10 of the United States Constitution.").

15

Petitioner does not appeal the circuit court's refusal to correct his sentence on Counts I and II; he appeals from the amended sentencing order only with respect to Count III, relating to the timing of his sexual abuse of H.C. We consolidated Petitioner's appeal of the amended sentencing order and his appeal of the original sentencing order.

## II. STANDARD OF REVIEW

Because Petitioner's multiple assigned errors are subject to different standards of review, we address each standard of review in connection with that section's analysis, below.

## III. ANALYSIS

Petitioner assigns four errors on appeal. For the first time, Petitioner argues that the jury was instructed on the law at the time of trial as opposed to the law at the time his crimes were committed in violation of the state and federal constitutional prohibition against ex post facto laws. Petitioner also raises ex post facto principles to challenge his sentence on Count III, arguing that he was sentenced for post-June 12, 1998 conduct when the State did not prove he violated West Virginia Code § 61-8D-5 after that date. Third, Petitioner argues that there was insufficient evidence of H.C.'s abuse to have permitted Counts III and VII to be considered by the jury. Finally, Petitioner argues that the circuit court abused its discretion in admitting the transcript of his 2003 interview with Lt. Zerkle in violation of Rule 1002 of the West Virginia Rules of Evidence and demands a new trial.

16

We examine each of these arguments in turn, but for the sake of clarity do not address them in the order presented by Petitioner.

## A.    2003 Transcript

Petitioner argues that the transcript of his 2003 interview with Lt. Zerkle should not have been admitted as evidence because it violates the "best evidence" rule, Rule 1002 of the West Virginia Rules of Evidence.[12]  Evidentiary determinations are reviewed for an abuse of discretion: "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."[13]

We need not consider whether the circuit court abused its discretion in admitting the evidence in spite of Rule 1002 because Petitioner did not raise Rule 1002 below.  Rather, Petitioner argued below that the transcript's admissibility was questionable, generally arguing that authentication could be an issue at a pre-trial hearing.  When the State noted that much of its case rested on the admissibility of the transcript, the circuit court took testimony from Lt. Zerkle regarding his office's retention policy and his recollection of the interview and creation of the transcript.  The circuit court then offered

---

[12] Rule 1002 requires that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a state statute provides otherwise."

[13] Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998).

Petitioner the opportunity to either receive a ruling based on the arguments and testimony or additional time to file a formal motion in limine outlining his objections for the court's consideration. Petitioner opted for the latter, and in the motion in limine raised only objections under Rules 403 (prejudice outweighing probative value), 901 (authentication), and 1004 (admissibility of other evidence of content).

In *State v. Degraw*, this Court refused to consider on appeal an objection under Rule 404(b) of the West Virginia Rules of Evidence when the defendant had objected below only to admission of the evidence pursuant to Rule 609.[14] In so doing, we explained that preservation of an objection under Rule 103 demands specific grounds of objection unless the specific ground was apparent from the context.[15] We cited with approval Justice Kenna's concurring opinion in *Leftwich v. Inter-Ocean Casualty Co.*[16] that reviewed evidentiary errors with an undercurrent of the borrowed principle of *expressio unius est exclusion alterius*:

> [i]t is well established that where the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the

---

[14] 196 W. Va. 261, 271-72, 470 S.E.2d 215, 225-26 (1996).

[15] *Id.* at 272, 470 S.E.2d at 226. Rule 103(a)(1) of the West Virginia Rules of Evidence provides, "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . if the ruling admits evidence, a party, on the record . . . timely objects or moves to strike; and . . . states the specific ground, unless it was apparent from the context[.]"

[16] 123 W. Va. 577, 585-86, 17 S.E.2d 209, 213 (1941) (Kenna, J. concurring).

18

admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified.[17]

And, in that case, we reiterated that "'a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal.'"[18]

Petitioner argues against a finding of waiver, contending that it was evident from the context that his objections tangentially invoked the best evidence rule without raising it specifically. Even were we to accept Petitioner's argument that his stated objections were sufficiently interrelated with the best evidence rule to permit us to analyze that rule in conjunction with his preserved objection based on Rules 901 or 1004, Petitioner did not appeal those overruled objections, and, for the reasons previously stated, did not preserve an appeal under Rule 1002. So, we decline to address this assignment of error on the merits.

## B. *H.C.'s Failure to Testify*

H.C.'s absence from the proceedings, Petitioner argues, created an evidentiary problem for the State because the State had insufficient evidence to prove that the crimes against H.C. (Counts III and VII) occurred in Putnam County, the venue alleged

---

[17] *Degraw*, 196 W. Va. at 272, 470 S.E.2d at 226.

[18] *Id.* (quoting 1 Jack B. Weinstein et al., *Weinstein's Evidence* ¶103[02] at 103-37 (1995).

in the indictment, as opposed to Kanawha County, and insufficient evidence to prove that

the sexual contact to which Petitioner subjected H.C. was done for sexual gratification.

Likewise, Petitioner argues that H.C.'s absence from the proceedings creates a sentencing

problem for Count III because the State could not prove that his crimes against H.C.

occurred after the June 1998 amendment to West Virginia Code § 61-8D-5, even if his

conviction could otherwise stand.  We examine these assigned errors in turn.

### 1. *Sufficiency of the Evidence as to Counts III and VII*

Petitioner raised his evidentiary arguments as to sufficiency of the evidence

on Counts III and VII by way of motion for judgment of acquittal.  Denial of that motion

is reviewed de novo: "this Court, like the trial court, must scrutinize the evidence in the

light most compatible with the verdict, resolve all credibility disputes in the verdict's favor,

and then reach a judgment about whether a rational jury could find guilt beyond a

reasonable doubt."[19]  Stated differently,

> [t]he function of an appellate court when reviewing the
> sufficiency of the evidence to support a criminal conviction is
> to examine the evidence admitted at trial to determine whether
> such evidence, if believed, is sufficient to convince a
> reasonable person of the defendant's guilt beyond a reasonable
> doubt. Thus, the relevant inquiry is whether, after viewing the
> evidence in the light most favorable to the prosecution, any

---

[19] *State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996).

rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.[20]

Petitioner's motion for a judgment of acquittal included two insufficiency arguments: (1) location of offense and (2) sexual gratification. Both arguments, as presented to this Court, are based on one theory – that Petitioner's statement alone cannot satisfy the proof of the corpus delicti of his crimes against H.C., and, for that reason, the State had not met its burden in these two respects as to Count III or Count VII.

In homicides, corpus delicti requires proof of the death of a human being and criminal agency as its cause.[21] More generally, corpus delicti mandates "proof that the crime occurred and that somebody's criminality was the source of the crime, as distinguished from noncriminal sources, e.g., accident or natural causes."[22] In *State v. Burton*, from which that definition was drawn, we applied that definition in concluding that the discrete elements of the state's burden of proof are not synonymous with the elements of the corpus delicti of a crime.[23] Set in the context of forcible rape, this Court explained in *Burton* that while the identity of the defendant as the person who committed the rape

---

[20] Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

[21] *State v. Garrett*, 195 W. Va. 630, 640, 466 S.E.2d 481, 491 (1995) (citing Syl. Pt. 4, *State v. Hall*, 172 W. Va. 138, 304 S.E.2d 43 (1983)).

[22] *Id.* at 640 n.14, 466 S.E.2d at 491 n.14 (quoting *State v. Burton*, 163 W. Va. 40, 45, 254 S.E.2d 129, 134 (1979)).

[23] *Burton*, 163 W. Va. at 45, 254 S.E.2d at 134.

was certainly an essential element of the state's burden of proof, it was not part of the corpus delicti, the latter merely requiring a showing that a rape had, in fact, occurred.[24]

"Corpus delicti," the term, is distinguished from the corpus delicti *rule* because the latter is implicated when the State intends to use a defendant's incriminating extrajudicial statement in proving his or her guilt. The corpus delicti rule, better named the "corroboration rule," requires the State to put on evidence independent from the defendant's statement that sufficiently corroborates its testament to the corpus delicti of the crime charged before a conviction may properly lie.[25] Because Petitioner gave an

---

[24] *Id. See also State v. William L.E.* 2016 WL 5941932 at *5 (W. Va. October 13, 2016) (memorandum decision) (corpus delicti of sexual abuse satisfied by psychologist's testimony that victim exhibited signs of having been sexually abused); *Garrett*, 195 W. Va. at 640-41, 466 S.E.2d at 491-92 (corpus delicti satisfied by evidence of skeletal remains of victim and circumstantial evidence of death by criminal agency, not accident); *State v. Mason*, 162 W. Va. 297, 305, 249 S.E.2d 793, 798 (1979) (corpus delicti satisfied by proof that a person died by drowning and injuries consistent with non-accidental occurrence).

[25] *See, e.g., State v. Blackwell*, 102 W. Va. 421, 135 S.E. 393 (1926); *Mason*, 162 W. Va. at 305, 249 S.E.2d at 798 ("The purpose of the corroboration rule is to reduce the possibility of punishing a person for a crime which was never, in fact, committed."). Independent corroboration is deemed necessary based on the assumption that confessions are often unreliable yet are powerfully persuasive. As one North Carolina case outlined, the corpus delicti rule has roots in seventeenth century England:

> Legal scholars trace the modern concept of *corpus delicti* to several seventeenth century English cases; the most notable among them is *Perry's Case*. *Perry's Case* involved a defendant who confessed to the murder of a missing English man. In his confession, the defendant implicated both his mother and brother in the homicide. All three were executed before the alleged victim was discovered *alive* years later. The public shock and horror

22

extrajudicial statement, he points us to Syllabus Point 5 of *State v. Garrett*, where this

Court held that,

> [t]he corpus delicti may not be established solely with an accused's extrajudicial confession or admission. The confession or admission must be corroborated in a material and substantial manner by independent evidence. The corroborating evidence need not of itself be conclusive but, rather, is sufficient if, when taken in connection with the confession or admission, the crime is established beyond a reasonable doubt.[26]

Petitioner argues that this point of law requires his acquittal for the charges relative to H.C.

because, without his extrajudicial statement, the State could not prove where the crime

occurred or that he received sexual gratification, and thus had not proven the corpus

delicti.[27]

---

resulting from this case and others with similar circumstances spurred the beginnings of the *corpus delicti* rule.

*State v. Smith*, 669 S.E.2d 299, 304 (N.C. 2008) (internal citations omitted).

Though not before this Court, we note generally that the corpus delicti rule has been widely criticized as archaic and has led to the adoption of an alternate "trustworthiness" standard – that is, if there is enough evidence tending to show that the confession is trustworthy, corpus delicti need not be independently established. *See*, *e.g.*, *Opper v. United States*, 348 U.S. 84 (1954).

[26] 195 W. Va. 630, 466 S.E.2d 481.

[27] Petitioner does not argue that his statement was involuntary, untruthful, or otherwise of questionable accuracy such that it invoked the independent corroboration rule's policy purpose of minimizing convictions based on forced or false confessions.

Here, Petitioner does not argue that H.C. was never subjected to touching the law recognizes as criminal, merely that that touching was not committed in Putnam County, as alleged by the State and that *he* received no sexual gratification from it. In other words, Petitioner does not appear to argue that the corpus delicti, as defined by this Court, is unsatisfied. Indeed, the corpus delicti here is readily proven by S.C.'s testimony that H.C. disclosed sexual abuse, Lt. Zerkle's testimony that H.C. disclosed sexual abuse, H.C.'s sisters' testimony (both direct and circumstantial) that H.C. was also being abused, and J.C.'s testimony that H.C. exhibited sexual behavior at an early age – all of which corroborate Petitioner's confession to sexually abusing H.C.

Instead, Petitioner invokes corpus delicti in his larger sufficiency of the evidence challenge to specific aspects of the State's case. Petitioner seemingly argues that *Garrett* requires each aspect of the State's case be proven independently from his confession beyond a reasonable doubt. Consistent with our case law, we reject the underlying premise of Petitioner's argument that the corpus delicti is unsatisfied; it required neither proof of location nor proof of Petitioner's sexual gratification, and, to the extent corroboration of the corpus delicti was necessary, it was presented in spades.

Petitioner's argument is more appropriately couched in simple terms of insufficiency of the evidence. This is so because, as argued by Petitioner, his statement contains no evidence that the crimes occurred in Putnam County and no evidence that he received sexual gratification from touching H.C. For that reason, neither is amenable to

24

"corroboration." We thus address Petitioner's assigned error as an argument that there was insufficient evidence to permit a jury to convict him as having committed the crimes in Putnam County or for the jury to have concluded that his sexual contact with H.C. was for sexual gratification.

We begin with the acknowledgement that "'venue is not a fact which relates to the guilt or innocence of the accused. It is therefore not a substantive element of the crime.'"[28] And, "[t]he State in a criminal case may prove the venue of the crime by a preponderance of the evidence, and is not required to prove the same beyond a reasonable doubt."[29]

Petitioner relies on a single encounter in the parents' bedroom in Kanawha County where Petitioner admitted to allowing H.C. to put his hand on her groin as seemingly dispositive that the other, multiple acts of abuse of H.C. also occurred in Kanawha County. That argument ignores that the jury was permitted to draw the reasonable inference that his specific reference to one incident that occurred in Kanawha County may have been because the other four instances occurred in a different location. The evidence showed that Petitioner had repeated contact with H.C. in Putnam County. In addition to Petitioner's own statement that he often had the children, and specifically H.C.,

---

[28] *State v. Tommy Y., Jr.*, 219 W. Va. 530, 537, 637 S.E.2d 628, 636 (2006) (quoting *Burton*, 163 W. Va. at 59-60, 254 S.E.2d at 141).

[29] Syl. Pt. 5, *Burton*, 163 W. Va. 40, 254 S.E.2d 129.

in his basement room in Putnam County, H.C.'s mother testified that Petitioner would ask for one child at a time – after taking H.C. down to the basement alone, he would then go back upstairs for M.C. The other victims testified that their own abuse occurred while in the Petitioner's basement in Putnam County and the description of their abuse while sitting on Petitioner's lap or beside Petitioner while watching television in the basement is consistent with Petitioner's own recitation of his sexual contact with H.C.

While H.C.'s failure to testify deprived the jury of direct evidence, the circumstantial evidence is of equal weight: "there is no qualitative difference between direct and circumstantial evidence."[30] Required as we are to view the evidence in the light most favorable to the prosecution and in favor of the verdict, we readily conclude that the evidence offered could lead a rational trier of fact to conclude by a preponderance of the evidence that Petitioner's sexual contact with H.C. occurred in Putnam County.

Petitioner's argument as to sexual gratification is limited to emphasizing the portion of the definition of "sexual contact" as meaning, in part, that the touching is "done for the purposes of gratifying the sexual desire of either party," and stating that Petitioner's contact with H.C. was not for sexual gratification, reiterating that *Petitioner* was uncomfortable. Notwithstanding that Petitioner also stated he knew he should have removed his hand and did not, Petitioner references H.C. placing his hand between her legs

---

[30] *Guthrie*, 194 W. Va. at 669, 461 S.E.2d at 175.

and applying pressure, consistent with (and even citing to) H.C.'s mother's testimony that H.C. began masturbating at an early age.[31] This in and of itself is sufficient evidence for a jury to conclude that the touching was done for "sexual gratification" because that term explicitly applies to *either* party. Likewise, the jury could have concluded that the touching was done for Petitioner's sexual gratification because, as we have recently explained, "a fact finder may infer the element of sexual gratification from the location of the touching, *i.e.*, breast and pubic area, and the absence of a medical reason for the touching."[32] Because Petitioner has not carried his heavy burden, we conclude the circuit court did not err in denying Petitioner's motion for judgment of acquittal.

### 2. *Sentencing as to Count III*

Restating his corpus delicti argument, Petitioner argues that his extrajudicial statement is the only evidence that his sexual abuse of H.C. occurred after the June 1998 amendments to West Virginia Code § 61-8D-5, and, for that reason, he is entitled to the pre-amendment, more lenient sentence for that crime. West Virginia Code § 61-8D-5 was indeed amended effective June of 1998 at which time the penalty increased from five to

---

[31] Because Petitioner has made an issue of venue, we include for the sake of accuracy that although Petitioner's brief quotes from a portion of his 2003 statement referring to an incident that purportedly occurred in Kanawha County, Petitioner referenced that H.C. placed his hands between her legs in the same fashion on four other occasions and stated "you've got whether she initiated it or whether I initiated it."

[32] *State v. Matulis*, No. 18-1053, 2020 WL 1487810, at *5 (W. Va. March 23, 2020) (memorandum decision) (citation omitted).

fifteen years' imprisonment to ten to twenty years. In this respect, Petitioner observes that the indictment charged him with having committed the conduct against H.C. in Count III between January of 1998 and March of 2003. Invoking ex post facto principles, he argues that the State needed to and did not prove he committed the offense against H.C. between June of 1998 and March of 2003 for the post-amendment, increased penalty to attach.[33]

"For purposes of assessing constitutional rights under the ex post facto clause of any penal statute intended to punish a person, the triggering date is the date of the offense."[34] So, as Petitioner argues, if he sexually abused H.C. between January of 1998[35] and June of 1998, the circuit court's refusal to correct his sentence violates ex post facto principles and it should be corrected; if he sexually abused H.C. at any point after June of 1998, there is no ex post facto violation. We return, then, to what the proof at trial showed as to the dates of H.C.'s sexual abuse and whether the jury could have concluded that the offense occurred after June of 1998.

H.C. was born in September of 1990. Petitioner's 2003 statement gives specific time markers: he admitted to touching H.C.'s breasts when she was "10, 9-10" and that he had touched her chest "two years ago." So, given Petitioner's statement alone, his

---

[33] *See supra* n.10.

[34] *Deel*, 237 W. Va. at 608, 788 S.E.2d at 749.

[35] S.C. testified that the family moved back to West Virginia in 1998 but did not specify which month.

crimes against H.C. occurred after the June 1998 amendment. To the extent Petitioner's timeline required any corroboration,[36] M.C. testified that she recalled a specific instance of abuse when she was eight years old (placing that abuse in 2000) and that she was aware Petitioner was also abusing H.C. M.C. also disclosed to her parents in 2003 that the abuse was happening to her and that it was also happening to H.C. That evidence is sufficient for the jury to have concluded that Petitioner violated West Virginia Code § 61-8D-5 after the June 1998 amendment that increased the statutory penalty. For that reason, the circuit court did not err in refusing to correct Petitioner's sentence as to Count III.

### C.     *Alleged Ex Post Facto Violations in Jury Instruction*

Petitioner's primary assignment of error is that the circuit court instructed the jury on the law at the time of trial as opposed to the law at the time of the offense, and the State does not disagree that the jury was, in part, improperly instructed. What the State and Petitioner disagree on is whether Petitioner's acquiescence to the error precludes this Court from reviewing it at all, so we address that threshold issue first.

#### 1.     *Reviewability and Standard of Review*

It is undisputed that the jury was incorrectly instructed on some portions of the law in effect at the time of trial rather than the law in effect at the time of the offenses.

---

[36] We address corroboration in this regard only for the sake of a complete review of Petitioner's posed sufficiency of the evidence arguments, having already concluded that the corpus delicti was satisfied.

29

But Petitioner below submitted jury instructions to the circuit court and noted that his proposed jury instructions did not meaningfully deviate from those in the standard charge; in other words, Petitioner did not preserve an objection to the jury's instruction. Asserting "[t]he general rule . . . that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection[,]"[37] the State argues that Petitioner may not challenge the jury's instruction on appeal unless he invokes plain error. Going one step further, the State argues that Petitioner's argument is unreviewable even for plain error because Petitioner did not merely fail to object to the instructions, but he *agreed* with them, and so has waived any right to challenge the jury's instruction.

The State relies on Syllabus Point 8 of *State v. Miller*:

> Under the "plain error" doctrine, "waiver" of error must be distinguished from "forfeiture" of a right. A deviation from a rule of law is error unless there is a waiver. When there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined. By contrast, mere forfeiture of a right—the failure to make timely assertion of the right—does not extinguish the error. In such a circumstance, it is necessary to continue the inquiry and to determine whether the error is "plain." To be "plain," the error must be "clear" or "obvious."[38]

---

[37] Syl. Pt. 3, *State v. Gangwer*, 169 W. Va. 177, 286 S.E.2d 389 (1982).

[38] 194 W. Va. 3, 459 S.E.2d 114 (1995).

30

The facts of *Miller*, the State argues, are on all-fours with this case and should be similarly resolved on waiver grounds. In *Miller*, the defendant sought appellate review of the failure to give a self-defense instruction.[39] In concluding that the defendant had voluntarily waived any right to have the jury instructed on self-defense, the Court noted that counsel did not submit a self-defense instruction and more than failing to object to the given instructions, explicitly agreed to the court's instructions.[40]

While we do not disagree with the State that a distinction is appropriately made between waiver and forfeiture, we find *Miller* distinguishable in that *Miller* involved a self-defense instruction, which is an affirmative defense, in contrast with this case, which involves an issue of constitutional magnitude if the jury was instructed on the wrong *crimes* and neither the State nor the circuit court was aware of it. For that reason, we find *State v. Deel* to be the more appropriate avenue of review in this case, in which we reviewed an ex post facto argument for plain error by concluding there was no knowing and intentional relinquishment or abandonment of a known right where all parties failed to appreciate the constitutional ramifications.[41] As we did in *Deel*, we elect to review the jury's instructions for plain error.

---

[39] *Id.* at 17, 459 S.E.2d at 128.

[40] *Id.* at 19, 459 S.E.2d at 130.

[41] 237 W. Va. at 608-09, 788 S.E.2d at 749-50.

Establishing plain error is no easy feat: "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."[42] And,

> [a]n unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.[43]

Importantly, plain error review places on the *defendant* the burden of proving prejudice:

> Assuming that an error is "plain," the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in circuit court, and the *defendant* rather than the prosecutor bears the burden or persuasion with respect to prejudice.[44]

---

[42] Syl. Pt. 7, *Miller*, 194 W. Va. 3, 459 S.E.2d 114.

[43] Syl. Pt. 7, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).

[44] Syl. Pt. 9, *Miller*, 194 W. Va. 3, 459 S.E.2d 114 (emphasis added). *See also U.S. v. Hastings*, 134 F.3d 235, 240 (1998) (collecting cases illustrating that convictions are

32

With this standard in mind, we turn to the jury's instructions as to West Virginia Code §§ 61-8D-5 and 61-8B-7.

### 2.    *Post-Conduct Statutory Amendments*

The law on which the jury was instructed differed in three respects from the law in effect at the time of the crimes—that is, the law on which the jury should have been instructed.  Those changes involve these three terms: "sexual contact," (West Virginia Code § 61-8D-1 and § 61-8B-1); "person in a position of trust," (West Virginia Code § 61-8D-5); and "younger than twelve" (West Virginia Code § 61-8B-7).

"Under *ex post facto* principles of the United States and West Virginia Constitutions, a law passed after the commission of an offense which increases the punishment, lengthens the sentence or operates to the detriment of the accused cannot be applied to him."[45]  As noted above, Petitioner argues, and the State concedes, that the jury was instructed, in part, on the law at the time of trial as opposed to the law at the time of Petitioner's crimes and that it was error.  We consider that error to be plain, but the inquiry does not end there; Petitioner must also prove that any potential ex post facto violation affected his substantial rights.  So, in view of our plain error standard, we must review each

---

reversed on plain error review only where defendant can show the error affected the outcome of the proceedings).

[45] *See* Syl. Pt. 1, *Adkins v. Bordenkircher*, 164 W. Va. 292, 262 S.E.2d 885 (1980).

portion of the instruction to which Petitioner assigns error to determine whether he has shown that the instruction error affected the outcome of the proceedings in circuit court.

The State did not address in briefing whether the faulty instructions, despite the error being plain, affected Petitioner's substantial rights or seriously affected the fairness, integrity, or public reputation of the judicial proceedings; its argument rested entirely on waiver until oral argument. Petitioner appears to argue that his substantial rights were necessarily affected by the instruction error, citing that he was subjected to a different standard of proof in violation of ex post facto principles.[46] Specifically, Petitioner relies on *State v. Hensler*, a per curiam opinion, in which this Court awarded the defendant a new trial based on the change in definition of "forcible compulsion" as "fundamentally alter[ing] the proof required for the offense" because the new language allowed conviction on "different and less testimony" than the prior language.[47] As we detail below, Petitioner's argument is unworkable because the evidence produced at trial could support a conviction under *either* version of the statutes. Petitioner has not shown that the jury convicted him based on "different" or "less" evidence than was required under the version of the statute at the time his crimes were committed, so he cannot meet his burden to show

---

[46] *But see United States v. Marcus*, 560 U.S. 258, 265, 130 S. Ct. 2159, 2165–66, 176 L. Ed. 2d 1012 (2010) (rejecting Second Circuit's approach to plain error of "any possibility no matter how unlikely" standard, cautioning that a potential ex post facto violation reviewed for plain error requires a showing of prejudice and such instruction errors do not necessarily create a fundamentally unfair trial).

[47] 187 W. Va. 81, 84, 415 S.E.2d 885, 888 (1992).

that he was prejudiced in that he cannot prove that the outcome of the proceedings was affected by the error.

### a. "Sexual Contact"

First, "sexual contact," a definition common to both West Virginia Code § 61-8D-5 and §61-8B-7 did not, at the time of the crimes, consider touching the buttocks to be criminal sexual contact. The following bold/strike-through demonstrates the relevant addition:

> "Sexual contact" means any intentional touching, either directly or through clothing, of the **breasts, buttocks,** anus or any part of the sex organs of another person, or ~~the breasts of a female or~~ intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.[48]

Because evidence was presented that Petitioner's sexual abuse of all the victims included touching their buttocks and because the State emphasized in closing arguments that Petitioner admitted to having done that, he argues that resting his convictions on statutes that did not criminalize that type of touching violates ex post facto principles.

---

[48] The bolded language "buttocks" was added to the definition of "sexual contact" in June 2007.

Our review of this statutory change and its potential impact on the jury's decision is limited to Counts I through IV, because the jury was properly instructed on the definition of "sexual contact" at the time of the crimes in relation to Counts V through VIII. Reviewing the testimony with respect to each of the victims, there is sufficient evidence for the jury to have convicted Petitioner on Counts I through IV for touching their breasts and vaginas irrespective of the evidence introduced that Petitioner also touched their buttocks. As we have already established, there was ample evidence, including Petitioner's own admissions, on which to have convicted Petitioner of having sexual contact with H.C. that involved touching both her breasts and vagina. L.C. testified that Petitioner touched her breasts under her shirt and that he would cradle her buttocks but use his pinky finger to touch her vagina. M.C. testified that Petitioner stuck his hand down her shirt and was "feeling all over" and that when he would rub her back he would go behind her pants and touch her vagina to avoid being seen going down the front of her pants. Finally, A.C. testified that Petitioner touched her vagina both under and over her clothes.

Based on that testimony, the jury could have convicted Petitioner of sexual contact with each of the victims separate and apart from any evidence that he also touched their buttocks. Unlike *Hensler*, there was simply an additional option to prove guilt under the new version of the "sexual contact" definition and the State did not need to avail itself of that new option to convince the jury to convict Petitioner. This is particularly evident given that the jury convicted Petitioner of "sexual contact" that did *not* include touching of the buttocks as to each of the victims in Counts V through VIII. Because Petitioner cannot

36

meet his burden to prove that the jury would not have convicted him had it been instructed on the prior version of the definition of "sexual contact" we cannot conclude that his rights were substantially affected such that application of the plain error doctrine is appropriate to award Petitioner a new trial on Counts I through IV.

> b. **"Person in a Position of Trust"**

The second way the jury's instruction differed from the law at the time the crimes were committed is that the category of offenders as "person[s] in a position of trust" did not exist in West Virginia Code § 61-8D-5[49] until 2005. At the time of the crimes, the category of offenders included only "parents, guardians, and custodians." Importantly, the jury was instructed on both the definition of "person in a position of trust" and a "custodian." And, the jury was specifically instructed that, under West Virginia law, a babysitter could be considered as a custodian. As we held in *State v. Stephens*: "[a] babysitter may be a custodian under the provisions of *W. Va.* Code 61-8D-5 [1998], and whether a babysitter [is] in fact a custodian under this statute is a question for the jury."[50]

Here, the jury heard evidence that Petitioner was "in charge" of the victims' care and supervision while in his basement living space and was even specifically referred to as a "babysitter" during the trial. Petitioner had a level of familiarity and frequency of

---

[49] That term is also defined in West Virginia Code § 61-8D-1 and that definition did not exist under that section until 2005.

[50] Syl. Pt. 1, *State v Stephens*, 206 W. Va. 420, 525 S.E.2d 301 (1999).

contact with the victims such that he considered himself "an extra dad."[51]  Further,

Petitioner could have, but did not, present evidence to challenge that he was ever charged

with temporary care and custody of the victims such that he could not qualify as a

"custodian."  So, we are unpersuaded that the jury convicted Petitioner as a "person in a

position of trust" as opposed to their "custodian" such that the result would have been

different had the jury only had before it the option to convict Petitioner as a "custodian,"

particularly because the overlap in those two categories is a factual question for the jury[52]

and both would be supportable by the evidence.

### c.    *"Younger Than Twelve Years Old"*

West Virginia Code § 61-8B-7(a)(3) provided at the time of trial – and the

jury was so instructed – that a person is guilty of sexual abuse in the first degree when

"such person, being fourteen years old or more, subjects another person to sexual contact

who is *younger than twelve years old*."[53]  The italicized portion of the statute, at the time

Petitioner's crimes were committed provided "eleven years old or less."  While Petitioner

argues this language altered the burden of proof, "eleven years old or less" means the same

thing as "younger than twelve."  In relation to the "eleven years old or less" language

---

[51] *See State v. Timothy C.*, 237 W. Va. 435, 450-51, 787 S.E.2d 888, 903-04 (2016).

[52] Syl. Pt. 4, *State ex rel. Harris v. Hatcher*, 236 W. Va. 599, 760 S.E.2d 847, 853 (2014) ("The question of whether a person charged with a crime under West Virginia Code § 61-8D-5 (2010) is a custodian or person in a position of trust in relation to a child is a question of fact for the jury to determine.").

[53] Emphasis added.

previously contained in – and subsequently amended to "younger than twelve" – West Virginia Code § 61-8B-3, sexual assault in the first degree, we held that "a person 'who is eleven years old or less' applies to a person who is eleven years old, but who has not reached his or her twelfth birthday."[54]  In other words, Petitioner's ex post facto argument fails because the change is stylistic, not substantive; if one is eleven years and three hundred and sixty-four days old, one is still eleven years old and under twelve.  For that reason, Petitioner was not subject to a different or higher standard of proof.

Because Petitioner has not met his burden to prove that his rights were substantially affected such that the outcome of the proceedings would have been different in any of these three respects, he is not entitled to a reversal of his convictions based on ex post facto violations.  In this case, given the posture before the Court, the limited changes in the law, and the evidence before the jury, we affirm Todd C.'s convictions even in light of the errors in the jury instructions implicating ex post facto concerns.  Still, we must remark on the errors' potential magnitude—errors that neither party, nor the circuit court, recognized, although the crime occurred approximately two decades before the trial.  While we recognize the pressures that the practitioners and the circuit court face, "[w]hen given,

---

[54] Syl. Pt. 8, in part, *State ex rel. Morgan v. Trent*, 195 W. Va. 257, 465 S.E.2d 257 (1995).

instructions to a jury are the court's instructions and, irrespective of who requests them, the court must see to it that all instructions conform to constitutional requirements."[55]

## IV. CONCLUSION

For the foregoing reasons, we affirm the Circuit Court of Putnam County's April 1, 2022 amended sentencing order.

Affirmed.

---

[55] Syl. Pt. 2, *State v. Dozier*, 163 W. Va. 192, 255 S.E.2d 552 (1979).